**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>USA DISCOUNTERS, LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-11755 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF TIMOTHY W. DORSEY IN SUPPORT OF**
**FIRST DAY MOTIONS**

I, Timothy W. Dorsey, declare as follows:

1.      I am the Vice President for USA Discounters, Ltd., a Virginia corporation ("USA Discounters").  I also serve as the Vice President for USA Discounters' parent corporation, USA Discounters Holding Company, Inc., a Delaware corporation ("Holdings"), and Manager for USA Discounters Credit, LLC, a Delaware limited liability company ("Credit LLC" and, collectively with USA Discounters and Holdings, the "Debtors").  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors, having served as Vice President of USA Discounters since 2003 and in my respective capacities of Holdings and Credit LLC since their inception in 2007.

2.      I am an attorney licensed to practice in the Commonwealth of Virginia since 1995.

3.      On the date  of the filing of this Declaration (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of the Bankruptcy Code, thus commencing

---

[1]   The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: USA Discounters, Ltd. (5123); USA Discounters Holding Company, Inc. (8192); and USA Discounters Credit, LLC (3128).  The Debtors' address is 6353 Center Drive, Building 8, Suite 101, Norfolk, Virginia, 23502.

these chapter 11 cases (the "Cases"). To enable the Debtors to operate effectively, minimize

disruption to their operations, and maximize the value of their assets, the Debtors have filed

various applications and motions seeking immediate or expedited relief. Specifically, the

following have been filed on behalf of the Debtors (collectively, the "First Day Motions"):

    (a)    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief (the "Cash Collateral Motion");

    (b)    Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (the "Joint Administration Motion");

    (c)    Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages, Salaries, Employee Agreement Payments, and Bonuses, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (the "Employee Compensation and Benefits Motion");

    (d)    Debtors' Motion for Entry of Order (I) Authorizing Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts, Account Control Agreements, and Certain Payment Methods, and (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion");

    (e)    Debtors' Motion for an Order (I) Authorizing Payment of Prepetition Sales, Use, Property, and Franchise Taxes and Similar Taxes and Fees and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "Taxes Motion");

    (f)    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures

for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion");

(g)     Debtors' Motion for Entry of an Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "Insurance Motion");

(h)     Debtors' Motion for Entry of an Order Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs (the "Customer Programs Motion");

(i)     Debtors' Motion for the Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365, and (II) Abandon Any Remaining Property Located at the Leased Premises Nunc Pro Tunc to the Petition Date (the "Lease Rejection Motion");

(j)     Debtors' Motion for Entry of an Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property (the "Rejection Procedures Motion");

(k)     Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date (the "Section 156(c) Application");

(l)     Debtors' Motion for Entry of an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Motion"); and

(m)     Debtors' Motion for Entry of an Order Extending the Debtors' Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Deadline Motion").

4.      This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support for additional motions and applications filed on or after the Petition Date.

5.      As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records.

Therefore, if called as a witness, I could and would competently testify to the matters set forth herein. My testimony herein is based on my service as an officer of the Debtors currently and in the past, my review of the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me, at my request, by other employees of the Debtors.

6.    Part I of this Declaration describes the business operations and background of the Debtors and of these Cases. Part II then sets forth the facts relevant to each of the First Day Motions.

## I.

## BACKGROUND

### A.    Overview of the Debtors.

7.    USA Discounters was founded in May 1991 in the City of Norfolk, Virginia, under the name USA Furniture Discounters, Ltd. Following a series of transactions and ownership changes, the Debtors raised additional capital through an investment by Parallel Big Wheel Investco, LLC. This investment helped fund USA Discounters' business operations and expansion through 2014.

8.    USA Discounters' retail business focused on providing flexible financing options to consumers for the purchase of brand-name consumer products, including furniture, appliances, televisions, computers, smartphones, jewelry, and other consumer goods. These goods were sold through two groups of stores – one group of specialty retail stores operating under the "USA Living" brand, typically in standalone locations, and seven additional retail stores operating under the "Fletcher's Jewelers" brand, typically in major shopping malls.

9.    Much of the USA Discounters' customer base included consumers with limited resources or tarnished credit profiles. A large percentage of the customer base included

members of the armed services and their families and other government workers.  USA

Discounters thus developed its business model around the provision of consumer credit in a

fashion that would allow its customer base to purchase products that might otherwise be out of

reach.

**B.      USA Discounters' Business Operations.**

       **1.      Employees and Stores.**

       10.      As of the Petition Date, USA Discounters employs approximately 154 individuals

on a full-time basis and 8 individuals on a part-time basis.  None of the employees are unionized.

       11.      As of the Petition Date, USA Discounters operates (i) seven "Fletcher's Jewelers"

retail stores, which are located in five states,[2] and (ii) executive offices, which are located in

Norfolk, Virginia.  All of the stores and executive offices are operated in leased premises.

       **2.      Accounts Receivable Generated Through Extensions of Credit.**

       12.      USA Discounters operated as a retailer of furniture, appliances, electronics,

bedding, jewelry, and other products.  USA Discounters' retail business was operated through

two separate brands, USA Living and Fletcher's Jewelers.  With many of its stores located near

military bases and other installations, USA Discounters has had a long and important relationship

with the military community.  As noted above, the retail stores operating under the "Fletcher's

Jewelers" brand are typically located in major shopping malls.

       13.      The vast majority of the products sold by USA Discounters were purchased

through consumer financing provided by USA Discounters (as of the Petition Date, USA

Discounters has discontinued credit sales and is selling the inventory remaining in the

---

[2]    More specifically, these stores are located in the Citadel Mall, Colorado Springs, CO; the Cordova Mall,
Pensacola, FL; the Rivercenter Mall, San Antonio, TX; the Cielo Vista Mall, El Paso, TX; the Southpark Mall,
Colonial Heights, VA; the Lynnhaven Mall, Virginia Beach, VA; and the Tacoma Mall, Tacoma, WA.

"Fletcher's Jewelers" stores only on a cash basis).  At the point of sale, USA Discounters would provide consumer credit through revolving or retail installment sales contracts (the "Customer Contracts"), the installment contracts typically having a term of 30 months, a fixed monthly payment, and including a security interest in the merchandise purchased by the consumer.  These Customer Contracts included a purchase price, an interest component and other finance charges, and provisions for late charges and other fees, all of which collectively create an anticipated revenue stream payable to USA Discounters (collectively, the "Receivables").

14.    USA Discounters retains and services its Receivables portfolio internally.  The portfolio is geographically dispersed and no concentrations exist within the portfolio.  The Receivables are analyzed collectively for impairment and in determining the allowance for doubtful accounts.

15.    As of August 15, 2015, the Receivables consisted of approximately 31,394 open Customer Contracts, with an aggregate unpaid gross balance of approximately $114 million and a remaining average term of approximately 19 months.  This aggregate gross balance is subject to reduction for impairment and doubtful accounts, which, as of July 31, 2015, was estimated in an aggregate amount of approximately $5.7 million.  The Receivables are USA Discounters' most significant asset.

### 3.    Customer Warranties.

16.    In addition to selling goods, USA Discounters historically offered to sell its products with an extended warranty plan against defects in material and workmanship for the original owner pursuant to separate warranty agreements ("Product Warranty").  The term of a Product Warranty typically runs through the term of the applicable Customer Contract.  A separate jewelry warranty plan ("Jewelry Warranty") was also sold that is a "lifetime warranty" to make certain repairs to purchased jewelry (Product Warranty and Jewelry Warranty are,

collectively, the "Warranties"). The cost of the Warranties for the customer was included as an item purchased and, in turn, the amount financed. Payment for the Warranties, therefore, is spread out over the term as part of the monthly charges due under the applicable Customer Contract. USA Discounters stopped selling Warranties for new customers in April 2015. Nevertheless, USA Discounters continued to honor its commitment to customers with existing Warranties by permitting them to continue and expand their warranty plans as part of any new purchases through USA Discounters' "add-on" purchase program (which effectively refinances the customer's preexisting purchases and Warranties into a combined arrangement that also includes the "add-on" items). The "add-on" purchase program itself was recently eliminated following closure of the remaining "USA Living" stores.

17.      As of August 1, 2015, there were approximately 20,625 open Product Warranty contracts and approximately 5,178 open Jewelry Warranty contracts, covering approximately $88 million worth of Receivables. As of July 31, 2015, USA Discounters had established an accounting reserve for claims under the Warranties of approximately $1.7 million, which is an estimate based on historical warranty repair costs combined with historical experience rates of warranty registrations and usage. Claims asserted in respect of certain of the Warranties should be covered under the bonds, reserves, or similar sources described more fully in paragraph 126 below.

**4.      Military Allotments.**

18.      Historically, a large percentage of USA Discounters' military customers make their monthly payments utilizing the "allotment" system established by the Department of Defense.

19.      An "allotment" occurs when the military paymaster automatically deducts money from an individual's military paycheck and pays it to a third party, often in satisfaction of a debt

obligation.  The use of allotments is generally subject to the discretion and consent of the affected military service member, although a process does exist (and is used by USA Discounters as one of its debt collection methods) to obtain involuntary allotments to satisfy judgments for commercial indebtedness.  The allotment system is subject to detailed regulatory requirements pursuant to the Department of Defense's Financial Management Regulation (DoD 7000.14-R, Volume 7A, Chapters 40 and 42, *available at* http://comptroller.defense.gov/FMR.aspx).

20.    Allotment payments to USA Discounters are processed through FirstNet, which is the bill payment services division of First Citizens Bank, and through the Defense Finance and Accounting Service, which was created by the Department of Defense in 1991 to standardize, consolidate, and improve accounting and financial functions throughout the department. FirstNet charges each consumer a fee of $2.00 per month to process the consumer's payments through allotment.  The consumers generally set up an allotment to deduct from their monthly pay an amount that is $2 more than the required monthly payment to USA Discounters.  Each month, FirstNet retains its $2 fee, then remits to USA Discounters the customer's scheduled monthly payment amount.  Contracts governed by Colorado law are an exception to this general process.  Because of the peculiarities of Colorado law, USA Discounters pays the $2 processing fee, not the consumer.  FirstNet invoices USA Discounters each month for the prior month's processing fees associated with Colorado contracts.  In total, USA Discounters pays approximately $1,500 per month in processing fees to FirstNet for Colorado account processing. USA Discounters seeks authority to continue paying such monthly processing fees, as FirstNet's payment processing facilitates the receipt of a material portion of USA Discounters' revenues.

C.    **Organizational Structure.**

21.    Holdings is a Delaware corporation that was organized in May 2007. Holdings

has a six-member board of directors, of which four director positions are presently filled.[3]

22.    USA Discounters is a Virginia corporation and a wholly-owned subsidiary of

Holdings. I am the sole director of USA Discounters, and I am also its Vice President, Secretary,

and General Counsel.

23.    Credit LLC is a Delaware limited liability company that was organized in May

2007. I am Credit LLC's manager. Credit LLC is a non-operating company whose sole purpose

was to facilitate the transfer of certain assets in connection with the 2007 investment by Parallel

Big Wheel Investco, LLC.

D.    **Capital Structure.**

1.    **Secured Debt.**

24.    USA Discounters is the borrower under that certain *Loan and Security Agreement*

dated as of October 3, 2012 (as subsequently amended, supplemented, or modified, including on

July 24, 2013, September 30, 2014, and June 24, 2015, the "Prepetition Loan Agreement" and

together with the Credit Documents, as defined in the Prepetition Loan Agreement, the

"Prepetition Credit Documents"), whereby a syndicate of lenders (the "Prepetition Lenders")

agented by Wells Fargo Bank, N.A. (in such capacity, the "Prepetition Agent," and, together

with the Prepetition Lenders, the "Secured Parties") provided an asset-backed revolving credit

facility of up to an original maximum principal amount of $85,000,000 and with a stated

maturity date of October 3, 2015 (the "Prepetition Facility"). As of the Petition Date, the

---

[3]    The current directors of Holdings are F. Barron Fletcher III, Richard Dell'Aquila, Alan P. Shor, and Chris
Perry. Jordan E. Slone and Norman Slone resigned from the board of Holdings on March 20, 2015, and
following their resignations, Slone Management, LLC did not appoint any replacement directors as
contemplated by that certain *Stockholders Agreement* dated as of May 18, 2007.

outstanding principal amount of all Obligations (as defined in the Prepetition Loan Agreement) owing by USA Discounters to the Secured Parties under and in connection with the Prepetition Credit Documents was approximately $60 million, plus additional amounts on account of accrued and accruing interest, charges, fees, costs, and expenses (including attorneys' fees and legal expenses).

25.    Borrowings under the Prepetition Credit Documents are secured by valid, perfected, enforceable, and non-avoidable first priority security interests and liens on substantially all of the personal property of USA Discounters (the "Prepetition Collateral"), including all its accounts receivable, inventory, and general intangibles, as well as cash and non-cash proceeds of any collateral. As discussed below, the Prepetition Agent not only is the depository bank on many of USA Discounters' deposit accounts, but also has extant deposit account control agreements regarding USA Discounters' primary deposit accounts.

26.    An event of default occurred under the Prepetition Loan Agreement in April 2015 (due to USA Discounters failing to meet certain financial covenants). The Debtors are unaware of any lender (including the existing Prepetition Lenders) willing to refinance the Prepetition Facility, either now or at its scheduled maturity in less than two months.

27.    Neither Holdings nor Credit LLC is a borrower, guarantor, or otherwise liable with respect to the Prepetition Facility.

28.    USA Discounters has certain other typical secured indebtedness, largely in respect of leased equipment such as vehicles, laptops, and copy machines (to the extent that such leases are recharacterized as disguised financing transactions, or insofar as the applicable lease grants the lessor a security interest in the subject equipment and the lessor has filed a UCC-1 financing statement). USA Discounters previously sold goods consigned from certain consignors,

including three consignors that filed UCC-1 financing statements, but USA Discounters returned all consigned goods to the applicable consignors during the week of June 22, 2015, and thus holds no consigned goods as of the Petition Date.

### 2. Unsecured Debt.

29.    USA Discounters is the borrower under four separate installment promissory notes payable to Branch Banking and Trust Company (collectively, the "BB&T Notes"). Each of the BB&T Notes matured on June 14, 2015. As of the Petition Date, the aggregate unpaid balance of the BB&T Notes is approximately $77,000. None of the Debtors has any funded indebtedness – secured or unsecured – beyond the Prepetition Facility and the BB&T Notes. Nevertheless, USA Discounters has accumulated a significant amount of accrued and unpaid trade and other unsecured debt in the normal course of its business, which, as of the Petition Date, amounted to approximately $2.5 million.

30.    Additionally, the Debtors anticipate that there will be substantial rejection damage claims filed by landlords against the Debtors' bankruptcy estates, including in respect of two leases as to which Holdings guaranteed USA Discounters' obligations to the applicable landlords and one lease as to which Credit LLC guaranteed USA Discounters' obligation to the applicable landlord. Claims may also be asserted against USA Discounters in respect of the prepetition Warranties, although USA Discounters intends to honor the Warranties during the pendency of the Cases, as set forth more fully in the Customer Programs Motion.

31.    Finally, USA Discounters is, from time to time, a defendant in certain litigation matters relating to claims arising out of its operations in the normal course of business. Among other cases, a putative class action by way of counterclaims in a collections matter is currently pending in the Superior Court for the District of Columbia.

**3.    Equity Interests.**

32.    Holdings is privately owned by two investment funds: (i) Parallel Big Wheel Investco, LLC, which owns 100% of the Series A Convertible Preferred Stock and 65% of the Series B Preferred Stock; and (ii) Slone Management, LLC, which owns 35% of the Series B Preferred Stock and 100% of the Common Stock.

33.    In May 2007, Holdings established the *USA Discounters Holding Company, Inc. 2007 Management Incentive Plan* (the "Management Incentive Plan").  Under the Management Incentive Plan, which covers primarily key employees, Holdings reserved a pool of shares of Common Stock which may be granted in the form of incentive stock options.  As of the Petition Date, there are 6,602 such options outstanding, none of which have been exercised.

34.    Each of USA Discounters and Credit LLC is a wholly-owned subsidiary of Holdings.

**E.    Events Leading to These Cases.**

**1.    USA Discounters Operates and Expands Its Business.**

35.    At the time of Parallel Big Wheel Investco LLC's investment in 2007, USA Discounters had ten "USA Living" stores and one warehouse open, nearly all located in the mid-Atlantic region.  Over the ensuing five years, USA Discounters expanded by adding fourteen "USA Living" stores, seven "Fletcher's Jewelers" stores, and four independent warehouses. These stores and warehouses spanned from Baltimore, MD, down to Jacksonville, FL, over to Chula Vista, CA, and up to Tacoma, WA.

36.    In recent years, businesses operating in the consumer retail space – particularly through a traditional "bricks-and-mortar" (as opposed to online) platform – have seen substantial pressures on their economic viability.  Some of the pressures have been the result of broad-ranging shifts in consumer preferences and activities (e.g., the increasing acceptance of the

Internet as a mode of purchasing products of all sorts), while others have been due to conditions in the general economy (e.g., continuing softness in certain labor markets and underemployment in large segments of the American population). In addition, competition has increased, particularly from "big box" retailers that enjoy far greater purchasing power because of their larger size and scale. Many retail businesses have filed for bankruptcy or otherwise failed during this period, including such well-known brands as Blockbuster, Circuit City, RadioShack, and Brookstone. Indeed, the last several months have seen a large number of clothing and other retailers filing for bankruptcy, often simply to liquidate the business, including Deb Stores, Caché, Simply Fashion, Delia's, RUUM American Kid's Wear, Anna's Linens, and others. USA Discounters' business has not been immune to the pressures affecting the retail industry more generally.

37.     As difficulties continued in the consumer retail space, USA Discounters' revenues and earnings began to decline. For the fiscal year ended April 30, 2013, the Debtors had consolidated earnings before interest, taxes, depreciation, and amortization ("EBITDA") of approximately $13 million based on total revenues of approximately $111 million. For the fiscal year ended April 30, 2014, however, total revenues had declined to approximately $99 million and EBITDA had dropped to approximately $6 million. Based on the current, unaudited results, the Debtors' fiscal year ended April 30, 2015, is expected to involve total revenues of approximately $82.4 million and EBITDA of approximately $2.7 million.

**2.     USA Discounters Retains Interim Management.**

38.     As a result of the downward trend in USA Discounters' business, the Holdings Board felt that new perspectives were needed. Commencing in 2013, the Debtors engaged global professional services firm Alvarez & Marsal to provide, on a contractual basis, leadership in key positions and consultation for various aspects of the business.

39.     In 2013, Laurence Sax, a Senior Director with Alvarez and Marsal, was named CFO of USA Discounters, and in May 2014, Jeff Feinberg, a Managing Director with Alvarez & Marsal, was named CEO.  In June 2015, Joseph J. Sciametta, also a Managing Director with Alvarez & Marsal, replaced Mr. Feinberg as CEO and President.

   3.     **USA Discounters Is Subject to Regulatory Investigations and Adverse Media Reports.**

40.     Throughout the company's history, USA Discounters has been subject to certain regulatory and governmental investigative demands and requests for information.  In recent years, such requests have been made by (i) the Consumer Financial Protection Bureau (the "CFPB"), (ii) the California Attorney General (the "California AG"), (iii) the North Carolina Attorney General (the "NC AG"), (iv) the Virginia Attorney General (the "Virginia AG"), and (v) the Administrator of the Colorado Uniform Consumer Credit Code (the "CO Administrator").

41.     With respect to the CFPB examination, USA Discounters was informed that the CFPB intended to initiate an administrative proceeding against USA Discounters under 12 U.S.C. §§ 5563 and 5565 for practices relating to the extension of credit in violation of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 & 5536.  In the interest of resolution of this matter, and without admitting or denying any wrongdoing, USA Discounters voluntarily agreed to the issuance of a consent order, which was entered in August 2014, *see In the Matter of USA Discounters, Ltd.*, Administrative Proceeding No. 2014-CFPB-0011 (Aug. 14, 2014) (the "CFPB Consent Order").

42.     In the CFPB Consent Order, the CFPB alleged that USA Discounters had violated provisions of the Consumer Financial Protection Act of 2010 in connection with a fee charged to members of the United States military as a condition of credit.  More specifically, the CFPB determined that a $5 fee charged for the services of SCRA Specialists, LLC was unfair and

deceptive because it was charged "in exchange for services that were never provided or had no representational value" and was made under misleading circumstances. *See* CFPB Consent Order ¶¶ 17-24. The CFPB Consent Order thus ordered USA Discounters, among other things, to stop charging the subject fee, to make full restitution to certain consumers for the amount of the SCRA Specialists fees previously charged to those consumers, to file certain restitution reports with the CFPB, and to pay a $50,000 civil money penalty to the CFPB. As of the Petition Date, USA Discounters has paid the $50,000 civil monetary penalty. Approximately $76,690 in mailed checks were either returned as undeliverable or became stale-dated in mid-June 2015 as a result of their not being presented to the bank for payment. Pursuant to the terms of the CFPB Consent Order, fee checks that go unclaimed by the consumers are to be remitted to the consumers' states of domicile pursuant to the Uniform Unclaimed Property Act or related state laws.

43.    With respect to the investigations and requests pursued by the California AG, NC AG, and Virginia AG, USA Discounters has responded to each of the information requests, including by producing certain documents. No specific claims have been asserted or pursued against any of the Debtors by any of these governmental units.

44.    Several state attorneys general initiated a multi-state investigation into USA Discounters' business practices in July 2015. USA Discounters is cooperating in this matter.

45.    On July 13, 2015, the CO Administrator, through the office of the Colorado Attorney General, filed a lawsuit against USA Discounters, which lawsuit is pending in Colorado State District Court for the City and County of Denver, Colorado, as *Meade v. USA Discounters, Ltd.*, Case No. 2015CV032520 (the "Colorado AG Lawsuit"). In the Colorado AG Lawsuit, the plaintiff alleges that USA Discounters violated various provisions of the Colorado Uniform

Consumer Credit Code and seeks injunctive relief against further violations, as well as damages, civil penalties, and other relief. The deadline for USA Discounters to answer the complaint in the Colorado AG Lawsuit was consensually extended to August 28, 2015.

46.    USA Discounters also has been the subject to press reports concerning its business. USA Discounters believes that these press stories contained many inaccurate and misleading statements about USA Discounters and its business practices. In fact, USA Discounters publicly responded, in detail, to many of the allegations. Nevertheless, the negative press likely has affected USA Discounters' business.

47.    In late September 2014, USA Discounters changed its primary operating brand name from "USA Discounters" to "USA Living", including by entirely replacing the old name in advertising and store signage and by changing the website URL to USALiving.com on October 1, 2014. The change reflected the fact that USA Discounters is not a discount store chain and has not operated as one. The decision to change the brand name was completely voluntary and was neither the result of any investigation nor the result of any bad press about the old brand name.

**4.    The Department of Defense Overhauls the Allotment System and Military Customers Reduce Discretionary Spending.**

48.    USA Discounters has been affected by cutbacks in military spending and personnel caused by budget sequestration and policy shifts in the military relating to promotion, reenlistment, and retention. These changes have in turn caused military members and their families to reduce their discretionary spending, including in respect of the sorts of products sold by USA Discounters. This ongoing downward trend in spending has created corresponding downward pressure on USA Discounters' revenues and those of its competitors.

49.     Recent changes in the allotment system have placed further downward pressure on the business.  In June 2013, U.S. Secretary of Defense Chuck Hagel directed the creation of an interagency governmental team to evaluate whether changes should be made to the military's allotment payment system.  Based on the activities of the interagency team, the Under Secretary of Defense recommended that certain revisions be made to the allotment system, which revisions were approved by Secretary Hagel on September 29, 2014.

50.     The Department of Defense's regulatory policy change prohibits the use of new allotments to purchase, lease, or rent personal property (including vehicles, appliances, and consumer electronics), effective as of January 1, 2015.  Preexisting allotments were not affected by the policy change, and the revision applies only to active duty service members.  *See generally* Military Pay Allotment Policy Change Notice, 79 Fed. Reg. 70,858 (Nov. 28, 2014).

51.     The Department of Defense's changes to the allotment system have affected USA Discounters' business.

**5.     Consideration of Various Strategic Alternatives.**

52.     The combined forces of (i) continuing difficulties in the retail sector, including the above-described conditions related to military customers, and (ii) approximately $60 million of secured debt that is in default and, in any event, maturing in October 2015 create enormous challenges for USA Discounters' ability to continue operating in its present form.  To date, the Debtors have not located a party willing to purchase the entire business as a going concern.  After fully considering the situation, the Holdings' Board and USA Discounters' senior management have concluded that there is no viable route through which to rehabilitate the business model and allow it to continue operating as a standalone entity outside of the bankruptcy process.

53.     Beginning in early 2015, the Debtors explored numerous alternatives, including a potential out-of-court wind down, a sale of some or all of their assets to third parties in or out of the bankruptcy context, a foreclosure by the Prepetition Agent, and chapter 7 bankruptcy filings.

54.     In connection with its exploration of alternatives, USA Discounters retained Stephens, Inc. ("Stephens") in April 2015 to act as its financial advisor in connection with the potential sale of all or a portion of USA Discounters' Receivables, inventory, and related assets to one or more purchasers.  Stephens engaged in discussions with various potentially interested parties in an effort to locate the best possible proposal.  Although Stephens procured several indications of interest and transaction proposals, neither the Debtors nor USA Discounters' secured lenders believed that any of those proposals were likely to maximize value, including because the proposals involved deeply-discounted purchase prices, many contingencies or similar execution risks, or other problematic terms.

55.     After considering all alternatives and after consulting with USA Discounters' secured lenders, the Debtors concluded that the path most likely to maximize value for their respective stakeholders would be to complete an internally-administered wind down of USA Discounters' Receivables, inventory, and other assets, including by using the tools available to debtors in possession under chapter 11 of the Bankruptcy Code.

56.     Once the Debtors concluded that the optimal path forward was an internally-administered wind-down process, USA Discounters negotiated a further amendment to the Prepetition Loan Agreement with its secured lenders (the "Third Amendment").  Among other things, the Third Amendment provided for a forbearance period and agreed funding pursuant to a budget that would enable USA Discounters to initiate the first phase of the wind-down process out of court.  The Third Amendment further included certain negotiated carve-outs from

proceeds of the Prepetition Collateral, including to provide funding for certain employee-related expenses, sales taxes, and professional fees. Some of the carve-outs in the Third Amendment extend into the Cases pursuant to the terms of the Third Amendment; other carves-out have been modified or replaced by carves-outs contained in the proposed cash collateral order.

57.   Following the execution of the Third Amendment, USA Discounters restructured its relationships with its non-insider workforce through individualized contracts that would ensure the retention of workers who are necessary to initiate and complete the internal wind-down process, provide employees with some certainty in the face of difficult circumstances, and protect the interests of USA Discounters and its stakeholders. The terms of these contracts are more fully described in Part II.C.1 below.

**6.    The Pre-Bankruptcy Inventory Sales Process.**

58.   As part of the internal wind-down process and following entry into the Third Amendment, on or about June 25, 2015, USA Discounters commenced a sales process in its stores, with a focus on conducting special inventory or similar sales in accordance with applicable agreements and non-bankruptcy law. As of the Petition Date, USA Discounters has completed the sales process in and closed all 24 of its "USA Living" stores and all of its warehouses. USA Discounters has not completed the sales process in any of the "Fletcher's Jewelers" stores. USA Discounters is still evaluating the available options with respect to the remaining "Fletcher's Jewelers" stores and related inventory.

59.   Pending a final decision about the optimal disposition of the stores and related inventory and the obtaining of any necessary relief from the Court, USA Discounters is continuing the inventory sales at the "Fletcher's Jewelers" stores that were commenced before the Petition Date. To the best of the Debtors' knowledge, the current sale process has been conducted in conformity with applicable leases and local laws.

60.    Although the Debtors' management believes that the internally-administered wind-down process is likely to maximize the value of the Receivables, the Debtors have not foreclosed other alternatives.

**F.    The Debtors' Goals in These Cases.**

61.    The Debtors intend to utilize the bankruptcy process to facilitate an orderly disposition of USA Discounters' assets – including Receivables and inventory – followed by a structured and judicially-supervised distribution of the resulting proceeds among the respective Debtors' stakeholders.

62.    The Holdings Board believes that the proposed path presents the best option for the Debtors to maximize the value of their estates under the circumstances.

63.    After filing of the Debtors' petitions, USA Discounters intends to operate its business in the ordinary course while pursuing all options for further maximizing value.  In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct the Cases efficiently and economically.

## II.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

64.    In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

65.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.     Cash Collateral Motion.**

66.     Substantially all of USA Discounters' cash, including payments received on the Receivables, is subject to the security interest of the Prepetition Agent and thus constitutes cash collateral.

67.     The usage of cash collateral will provide USA Discounters with funds necessary for the operation of USA Discounters' businesses through the post-bankruptcy process, including meeting its payroll and other business obligations. Without the immediate use of cash collateral, USA Discounters would be unable to fund its operations, which would be catastrophic for the Debtors and all stakeholders. I believe that access to cash collateral is crucial to maintain the business and to avoid immediate and irreparable harm to the estates, employees, customers, and creditors.

68.     I believe that timely approval of the relief requested in the Cash Collateral Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**B.     Joint Administration Motion.**

69.     The Debtors in these Cases are affiliated entities. The Debtors' financial affairs and business operations are closely related. Debtor Holdings is the sole shareholder of Debtor USA Discounters and owner of all membership interests of Debtor Credit LLC. All of the Debtors are under common management. The Debtors share some creditors and parties in interest. As a result, joint administration will prevent duplicative efforts and unnecessary expenses.

70.     I understand that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the

Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates.

## C.    Employee Compensation and Benefits Motion.

71.    USA Discounters' workforce is comprised of full-time salaried employees, full-time hourly employees (collectively, the "Full Time Employees"), and regular part-time hourly employees ("Part Time Employees," and together with the Full Time Employees, the "Employees"). As of the Petition Date, USA Discounters employs approximately 127 hourly Full Time Employees and 27 salaried Full Time Employees, for a total of 154 Full Time Employees, and 8 Part Time Employees. The foregoing numbers reflect the reduction in force first implemented by USA Discounters in June 2015, and continuing thereafter, in connection with the initiation of a chain-wide inventory sales process, as discussed in greater detail below. All of USA Discounters' Employees are based either at the Norfolk, Virginia headquarters or at one of USA Discounters' store locations.

72.    All Employees are paid bi-weekly on Fridays for the prior two weeks ending on the previous Saturday of any payroll week. Payroll to the Employees is funded in gross to Paylocity Web Pay ("Paylocity"), USA Discounters' third-party payroll administrator, one business day before each pay date, and Paylocity is responsible for distributing net pay to the Employees from its own accounts. USA Discounters' most recent prepetition payroll date was August 20, 2015. It covered the pay period from August 2, 2015 through August 15, 2015, and included amounts associated with terminating Employees who worked in the recently-closed "USA Living" stores, warehouses, and the USA Discounters credit department. The total amount of the August 20, 2015 payroll was approximately $756,000. USA Discounters' next scheduled payroll date is September 4, 2015, and will cover the pay period from August 16, 2015

through August 29, 2015.  Consistent with the ordinary course of dealings between USA

Discounters and Paylocity, funds in respect of this pay period have not yet been withdrawn from

USA Discounters' accounts.  USA Discounters expects that postpetition bi-weekly payroll

expenses through the first three months of the Cases will be in the range of approximately

$344,000 – $497,000, subject to any postpetition reduction in workforce.

73.    The Debtors' ability to maximize the value of the estates depends on the expertise

and continued enthusiasm and service of USA Discounters' Employees.  Due to the disruption

and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the

Employees may be adversely affected, particularly in light of the largely wind-down nature of

these particular Cases.  If USA Discounters fails to pay the Employee Claims in the ordinary

course, the Employees will suffer personal hardship and, in some cases, may be unable to pay

their basic living expenses.  This outcome would have a negative impact on workforce morale

and likely would result in unmanageable performance issues or turnover, thereby causing

immediate and irreparable harm to the Debtors and their estates.

74.    As of the Petition Date, approximately $230,000 was earned but remains

unfunded with respect to Employees on account of accrued prepetition wages and salaries.

75.    In addition, USA Discounters occasionally contracts with additional workers, who

are either independent contractors or employees leased from temporary placement agencies.  As

of the Petition Date, there is one such additional worker.  This individual is compensated outside

of USA Discounters' payroll system, and receives, in the aggregate, approximately $1,000 per

week.  The additional worker is owed approximately $1,000 in respect of prepetition services.

1.    **The Employee Agreements with Non-Insider Employees.**

76.    In June 2015, USA Discounters entered into individual agreements with all of its

non-insider Employees through forms of *Agreement and General Releases* (the "Employee

Agreements") setting forth the expected timeframe on which each such Employee would

continue to be employed by USA Discounters, and providing for payment terms for the

Employee through that timeframe, including (in some instances) certain incentive and retention

payments as more specifically set out below (the "Employee Agreement Payments"). The

Employee Agreement Payments were designed to maintain morale and retain critical employees

through the completion of the applicable phases of the wind-down process. USA Discounters

believed it was important to negotiate and execute these individualized agreements in light of the

Employee layoffs that had recently occurred and were expected to continue to occur as the wind-

down process unfolded. For example, in connection with the initiation of a chain-wide inventory

sales process on June 25, 2015, USA Discounters immediately terminated seven of its

Employees – one of whom worked in USA Discounters' stores, two of whom worked in USA

Discounters' credit department, and four of whom worked in USA Discounters' other corporate

departments. Subsequent Employee terminations have occurred as USA Discounters has

continued to sell inventory and close stores.

77.     The Employee Agreements entered into with certain critical non-insider

Employees provide for various Employee Agreement Payments depending on the function of

each respective Employee and the significance of the Employee's role in the successful

completion of the wind-down process. The Employee Agreement Payments provided for in the

various Employee Agreements are as follows:

a.     Store General Managers received an increase in their hourly pay rate and
are eligible for double sales commissions for sales from June 25, 2015
through the completion of the store sales process. Store General Managers
may also earn a bonus of $100 to $2,500 if they keep inventory losses (or
"shrink") within certain limits over the duration of the sales process (the
amounts vary based on the duration of the applicable store's sales process
and the amount of shrink). The total amount contemplated for "shrink"
prevention bonuses for these seven remaining Employees is estimated to

be approximately $14,000. Finally, Store General Managers are eligible for a severance payment upon termination of their employment. The double sales commissions, shrink bonus, and severance payment are payable only if the Store General Manager works through his or her respective expected store closure date.

b.    All other store-based, sales-related personnel received an increase in their hourly rate and are eligible for double sales commissions for sales from June 25, 2015 through the completion of the store sales process. The total amount contemplated for sales commission bonuses for these approximately 37 remaining Employees is estimated to be approximately $215,579.[4] These Employees are also eligible for a severance payment upon termination of their employment. The double sales commissions and severance payment are payable only if the Employee works through his or her respective expected store closure date.

c.    Area Managers are eligible for a retention bonus. The retention bonus amounts range from $5,000 to $10,000 for each Area Manager based on the Area Manager's expected duration of continued employment with USA Discounters. The total amount contemplated for retention bonuses for all five remaining Area Managers is estimated to be approximately $30,000. Area Managers are also eligible for a severance payment upon termination of their employment. The retention bonus and severance payment are payable only if the Area Manager works through the completion of the store sales process (as the process and associated employment terms may be extended pursuant to footnote 4).

d.    Corporate personnel with expected termination dates within six months of the signing of the Employee Agreements ("Departing Corporate Employees") are eligible for a retention bonus. The retention bonus amounts range from $500 to $50,000 for each Departing Corporate Employee based on the Employee's anticipated impact on the business and expected duration of continued employment with USA Discounters. The total amount contemplated for retention bonuses for all Departing Corporate Employees is estimated to be approximately $105,900. Departing Corporate Employees are also eligible for a severance payment

---

[4]    The exact amount and timing of any commission payments will depend on the progress of inventory sales in the "Fletcher's Jewelers" stores. With respect to Store General Managers, Area Managers, and sales personnel at the remaining "Fletcher's Jewelers" stores, the Employee Agreements contemplated that these Employees would be terminated and eligible to receive any final Employee Agreement Payments as of September 30, 2015. In order to take advantage of potential sales opportunities through the holiday season, pursuant to the relief requested by the Employee Compensation and Benefits Motion, USA Discounters may, in its business discretion, offer an extension of the terms of these particular Employee Agreements that would involve the subject Employees remaining through December 31, 2015, with a continuing entitlement to the same hourly wages and commission payments otherwise applicable under their Employee Agreements, but USA Discounters would make the Employee Agreement Payments to which the subject Employee would otherwise be eligible on the originally-agreed September 30 date.

upon termination of their employment. The retention bonus and severance payment are payable only if the Departing Corporate Employee works through a specified date, which date varies based on job function. It is possible that USA Discounters may seek to extend the termination date for some of the Departing Corporate Employees. If any of these Employees are later offered continued employment beyond the date contemplated in his or her respective Employee Agreement, the Employee's retention bonus is immediately payable while the severance payment will not be payable until such time as the Employee is later terminated due to job elimination. Such offers for continued employment will also include a retention bonus at the rate of 25% of the Employee's annual compensation.

e.    Retained corporate, collections, and legal personnel are eligible for a retention bonus. The retention bonus amounts are generally set at the rate of 25% of the Employee's annual compensation (so, for example, Employees who will be retained for six months are eligible for a retention bonus equal to 12.5% of annual compensation, and those Employees who will be retained for one year are eligible for a retention bonus equal to 25% of annual compensation). The individual retention bonuses for these Employees range from $1,664 to $43,750. The total amount contemplated for retention bonuses for all these Employees is estimated to be approximately $778,321. These Employees are also eligible for a severance payment upon termination of their employment. The retention bonus and severance payment are payable only if the Employee works through a specified date. The Employee Agreements for these Employees contemplate terms through June 1, 2016 or December 31, 2015, depending on the particular Employee's job function. If any of these Employees are later offered continued employment beyond the date contemplated in his or her respective Employee Agreement, the Employee's retention bonus is immediately payable while the severance payment will not be payable until such time as the Employee is later terminated due to job elimination. Such offers for continued employment will also include a retention bonus at the rate of 25% of the Employee's annual compensation.

78.    In all cases, the amount of the severance payments contemplated by the Employee Agreements is calculated based on USA Discounters' historical formula of one week of severance pay for each full year of service by the subject Employee.[5] If all severance is payable, the total amount that has accrued and would be paid, over time, to all eligible Employees is

---

[5]   USA Discounters did not maintain a written severance pay policy for the majority of Employees generally. However, USA Discounters regularly provided severance payments to Employees when their positions were eliminated, typically on the basis of one week of pay for each year of service by the subject Employee. These historical practices were formalized in the Employee Agreements.

$488,799.  The approximate total amount of Employee Agreement Payments that is expected to be paid out to all Employees during the first 30 days of these Cases is $0 in the aggregate; the approximate total amount of Employee Agreement Payments that is expected to be paid out to all Employees during the subsequent 30 days of these Cases is $347,000 in the aggregate.

79.    The Employee Agreement Payments are specifically tailored to combat the rising attrition rate faced by USA Discounters in the wake of the ongoing store closures and the corresponding reductions in work force, and are designed to boost Employee morale and retain certain Employees who are critical to the successful completion of the wind-down process.  As such, the Employee Agreement Payments are not a substitute for the Employee Bonus Programs (as defined below), which USA Discounters has historically maintained, including before the commencement of the inventory sales process.  No Employee Agreement Payments to any insiders (as defined in section 101(31) of the Bankruptcy Code) are contemplated under the Employee Agreements.  Moreover, USA Discounters will only make postpetition payments under the Employee Agreements to Employees who are employed by USA Discounters on and after the Petition Date, since these Employees are continuing to work and rely on their Employee Agreements while conferring benefits on USA Discounters' bankruptcy estate from and after the Petition Date.

**2.    Other Employee Programs.**

80.    In order to ensure optimal performance by the Employees, USA Discounters has historically implemented several bonus and incentive programs (collectively, the "Employee Bonus Programs").  The Employee Bonus Programs are as follows:

> a.    Sales personnel in the remaining "Fletcher's Jewelers" stores earn a four percent (4%) commission on sales of jewelry.  The percentages used to determine amounts payable under this program were increased in connection with the applicable Employee Agreements described above.

b.   Store General Managers earn a monthly store sales bonus of anywhere from 0.50% to a high of 1.5% of sales (the amounts vary based on the volume of store sales and the extent to which the budget is exceeded). The percentages used to determine amounts payable under this program were increased in connection with the applicable Employee Agreements described above.

c.   Recovery Collectors are eligible for a bonus as a percentage of payments received if they achieve their personal collections goal, and double that bonus if both their personal goal and their team's goal are achieved.

d.   Recovery Supervisors are eligible for a monthly or quarterly bonus if their team exceeds recoveries over the prior year, which bonuses range from $125.00 to $250.00 monthly bonus for one supervisor, and from $125.00 to $1,500.00 in quarterly bonuses for the remaining supervisors, depending on the amount by which the recoveries were exceeded over the prior year.

e.   Front End Collectors and their supervisors are eligible for a bonus based on how they placed in the pack of all collectors on payments received or delinquency cleared, which bonuses ranging from $100.00 to $400.00.

f.   From time to time, USA Discounters may implement additional bonus programs to encourage sales competition among stores, with the amount of any particular discretionary, one-time bonus program not to exceed $1,500 per individual.

As of the Petition Date, USA Discounters estimates that $27,000 in the aggregate is owed to Employees in respect of prepetition obligations under the Employee Bonus Programs.

81.   *Vacation Time.* Full Time Employees accrue vacation time ("Vacation") upon their anniversary date. Vacation time for the majority of Employees is accrued based on years of service. Full Time Employees with one to two years of service can earn up to five Vacation days, or 40 hours, per year. Full Time Employees with three to four years of service can earn up to 10 Vacation days, or 80 hours, per year. Finally, Full Time Employees with five or more years of service can earn up to 15 Vacation days, or 120 hours, per year. In the event that Vacation is not used by the end of the benefit year, Full Time Employees are not paid for the unused Vacation time and the Vacation balance is reset to zero at the end of each Full Time

Employee's anniversary year.  For Full Time Employees in California, unused Vacation time instead carries over from year to year with a maximum Vacation accrual of 15 days, or 120 hours.  Vacation pay is calculated based on an Employee's base hourly pay or base salary.  At separation of employment, earned but unused Vacation is paid out to Full Time Employees.

82.    Certain high-level Employees are entitled to a set amount of Vacation time regardless of years of service, with each such agreement being negotiated at the time of hire. Typically, the Employee would be entitled to a full three weeks of Vacation time in his or her first year of employment without reference to the above-described accrual schedule.  At separation of employment, earned but unused Vacation is paid out to these high-level Employees.

83.    During the week of June 22, 2015, USA Discounters made payments of approximately $313,000 in the aggregate in order to cash all Employees out of their Vacation accrued through that period and ensure that those Employees would not be absent from work during critical times in the wind-down process.  Then, during the week of August 16, 2015, USA Discounters made further payments of approximately $86,000 in the aggregate in order to cash additional Employees out of the Vacation accrued through that period, once again to ensure that those Employees would not be absent from work in the coming weeks.  As of the Petition Date, only one Employee had accrued and unused Vacation, which accrued and unused Vacation is in the amount of approximately $19,261.  Should particular Employees later reach their respective anniversary date, additional Vacation may accrue.

84.    Except as set forth in the following paragraph, the amount owed to any individual Employee on account of prepetition Employee claims for such Employee's accrued wages,

severance, and Vacation does not exceed $12,475 and is not in respect of any time period more than 180 days before the Petition Date.

85.     Because of their long tenure with USA Discounters, nine non-insider Employees have prepetition claims that exceed $12,475 because of the amount of their accrued prepetition wages, Vacation, and/or severance.[6] USA Discounters does not seek authority to pay these Employees any amounts in excess of $12,475 on account of these prepetition claims.  One insider Employee also has prepetition claims that exceed $12,475 on account of accrued prepetition wages and severance.[7] USA Discounters does not seek authority to pay this Employee any amounts in excess of $12,475 on account of these prepetition claims (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

86.     *Paid Time Off.*  USA Discounters provides paid time off ("PTO") to all Full Time Employees for temporary absence due to illness, injuries, and other unanticipated matters. Eligible Employees accrue throughout the year on a pro-rata basis six PTO days, or 48 hours, per twelve-month period, which period begins the first week of the month following the completion of the Employee's first 90 days of employment.  For Employees in the District of Columbia, PTO instead begins to accrue upon the date of hire.  Unused PTO may be carried over to the next twelve-month period, provided that Employees may only accrue a maximum of 30 PTO days, or 240 hours, at any point in time.  Further, Employees are generally prohibited from using more than five PTO days, or 40 hours, at any given time.  PTO pay is calculated based on an

---

[6]   The aggregate amounts of these non-insider Employees' prepetition claims are as follows: $36,347; $31,109; $27,693; $26,161; $21,779; $16,182; $13,745; $13,077; and $12,927.  These aggregate amounts exclude the amount of any retention payments payable under the Employee Agreements, as discussed more fully in paragraphs 76-79 above.  Any payments made in respect of these aggregate claims will be applied first to prepetition wages, then to any accrued prepetition Vacation, and last to accrued severance.

[7]   The aggregate amount of this insider Employee's prepetition claim is $98,282.

Employee's base hourly pay or base salary and payment is within the discretion of management. Full Time Employees are not paid for unused PTO days upon termination of employment or retirement, and USA Discounters therefore does not make any cash payments on account of the PTO policy if PTO days go unused.

87.    Prior to the Petition Date, USA Discounters offered Full Time Employees various standard employee benefits (the "Benefit Programs") including, without limitation, (a) medical and prescription drug coverage, (b) dental insurance, (c) vision insurance, (d) COBRA coverage, (e) flexible spending accounts, (f) life insurance, (g) short-term and long-term disability insurance, and (h) certain paid holidays.  Such benefits are administered pursuant to plans, programs, and policies that cover USA Discounters' Full Time Employees.  The amounts set forth below reflect the approximate prepetition cost of such Benefit Programs, which USA Discounters seeks to continue in the ordinary course of its business.  USA Discounters expects that Benefit Program expenses going forward will be consistent with the foregoing, subject to any reduction in cost as a result of the reduced workforce.

88.    *Medical Insurance Program.*  USA Discounters offers a medical and prescription drug program (the "Health Plan") to Full Time Employees, which is administered by Anthem. For the Employees themselves, the Health Plan is approximately 80% paid by USA Discounters and 20% paid by USA Discounters' Full Time Employees through payroll withholding.  For those Employees electing to cover their dependents, that portion attributable to coverage for such dependents is approximately 30% paid by USA Discounters and 70% paid by the Full Time Employee electing such coverage, which premiums are also paid by payroll withholding. Payments in respect of Health Plan premiums are remitted in full by USA Discounters, and Employee contributions are subsequently recovered by USA Discounters during the payroll

process. The average monthly cost to USA Discounters (without considering amounts paid from Employee withholding) of maintaining the Health Plan has been approximately $100,224. As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Health Plan.

89.    *Dental Insurance Program.* USA Discounters offers a dental program (the "Dental Plan") to Full Time Employees, which is administered by Humana. The Dental Plan is approximately 75% paid by USA Discounters and 25% paid by USA Discounters' Full Time Employees through payroll withholding. Payments in respect of Dental Plan premiums are remitted in full by USA Discounters, and Employee contributions are subsequently recovered by USA Discounters during the payroll process. The average monthly cost to USA Discounters (without considering amounts paid from Employee withholding) of maintaining the Dental Plan has been approximately $4,311. As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Dental Plan.

90.    *Vision Insurance Program.* USA Discounters offers vision insurance to Full Time Employees through Humana (the "Vision Plan"). The Vision Plan is approximately 75% paid by USA Discounters and 25% paid by USA Discounters' Full Time Employees through payroll withholding. Payments in respect of Vision Plan premiums are remitted in full by USA Discounters, and Employee contributions are subsequently recovered by USA Discounters during the payroll process. The average monthly cost to USA Discounters (without considering amounts paid from Employee withholding) of maintaining the Vision Plan has been approximately $612. As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Vision Plan.

91.    *Life, Disability, and Related Insurance Coverage.* For Employees with specified tenure, USA Discounters provides Full Time Employees with company-funded short-term and

long-term disability insurance, accidental death and dismemberment insurance, and basic life insurance, which are all insured by Anthem. USA Discounters pays 100% of the costs of these benefits. In the aggregate, the average monthly cost to USA Discounters of maintaining the Life and Disability Plans has been approximately $6,928. As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Life and Disability Plans.

92.     *COBRA*. USA Discounters seeks to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect of former Employees and their covered dependents. The former Employees pay 100% of the premiums for COBRA benefits.

93.     *Supplemental Insurance*. USA Discounters offers Full Time Employees supplemental insurance administered by Aflac (the "Supplemental Insurance"). Employees pay 100% of the premiums for Supplemental Insurance via payroll withholding.

94.     *Flexible Spending Accounts*. USA Discounters offers Full Time Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan and dependent claims. The flexible spending benefits (the "Flex Benefits") are administered by Wage Works. USA Discounters has paid approximately $500 per month for administration of all Flex Benefit plans (the "Flex Benefits Fee"). As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Flex Benefits Fee.

95.     *Paid Holidays*. USA Discounters offers paid holidays for Full Time Employees for six specified holidays (the "Paid Holidays"). Employees are paid eight hours for Paid Holidays if they do not work on such holiday, or are paid eight hours of pay on top of their earned wages if they do work on Paid Holidays (or, at their election, Employees may "bank" such eight hours as Vacation). As of the Petition Date, USA Discounters believes that no

amounts are owed to Employees in respect of Paid Holidays (excluding any amounts earned for Paid Holidays that the Employee banked as Vacation, which amounts are instead included above as Vacation).

96.    As of the Petition Date, certain of the Benefit Programs described above remained unpaid or not yet provided because certain obligations of USA Discounters under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of these Cases, but will not be required to be paid or provided in the ordinary course of USA Discounters' business until a later date. These programs are an important component of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and minimize attrition among those whose retention is important for the Debtors' success. I believe that the expenses associated with honoring such programs are reasonable and necessary in light of that potential attrition, loss of morale, and loss of productivity that would occur if such programs were discontinued.

97.    USA Discounters maintains a workers' compensation benefits program through Liberty Mutual Insurance (the "WC Program"). The WC Program provides benefits to all of USA Discounters' Employees for claims arising from or related to the Employee's employment with USA Discounters. The annual premium for the WC Program is approximately $323,823, and as of the Petition Date, USA Discounters believes it owes no amounts in respect of the WC Program.

98.    USA Discounters maintains a 401(k) plan (the "Retirement Plan"), administered by John Hancock, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future. The Retirement Plan is funded by Employee contributions only. USA Discounters pays

approximately $8,000 each year for the audit of the Retirement Plan. An audit for the plan year ending December 31, 2013 was performed in mid-2014. In addition, USA Discounters pays approximately $12,000 to a third party administrator for annual administration, compliance testing, audit assistance, and preparation of the annual Form 5500 and required schedules. As of the Petition Date, USA Discounters believes it owes no amounts in respect of administering the Retirement Plan.

99.    Prior to the Petition Date, USA Discounters directly or indirectly reimbursed Employees for certain expenses incurred on behalf of USA Discounters in the scope of their employment. The Employee Expenses are incurred in the ordinary course of USA Discounters' business operations and include, without limitation, expenses for meals, travel, lodging, and other business-related expenses. Historically, approximately $30,000 has been paid on account of Employee Expenses each month. USA Discounters estimates that, as of the Petition Date, approximately $5,000 in Employee Expenses remain unpaid. Additionally, USA Discounters provides certain corporate Employees with "Pex Card" prepaid credit cards that the applicable Employees use to pay for Employee Expenses in the ordinary course of business. Currently eighteen Employees hold Pex Cards. As of the Petition Date, the total amount funded to all Pex Cards is approximately $38,000 in the aggregate for all eighteen Employees.

100.    USA Discounters' payroll administrator, Paylocity, routinely deducts certain amounts from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs, and other similar programs. USA Discounters deducts certain amounts from

Employees' compensation that represent earnings that the Employees have designated for deduction for Supplemental Insurance and Flex Benefits (the "Employee Withholdings"). The amount deducted and remitted by USA Discounters in respect of Employee Withholdings is approximately $13,000 in the aggregate per month. In addition, USA Discounters is responsible for remitting to Paylocity, for its own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes"). USA Discounters has paid approximately $340,000 in the aggregate for employer-obligated Payroll Taxes each month.

101.    USA Discounters pays Paylocity approximately $3,000 per month for its administrative payroll services (the "Paylocity Fee"). The Paylocity Fee is funded bi-weekly on the check date of each payroll for associated payroll costs. As of the Petition Date, USA Discounters believes that no amounts are owing in respect of the Paylocity Fee.

102.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates. I believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is great risk that the Employees required to maximize value will seek alternative opportunities. Such a development would deplete USA Discounters' workforce, thereby hindering the Debtors' ability to successfully conduct these Cases.

**D.    Cash Management Motion.**

103.    In the ordinary course of its business, USA Discounters maintains a complex cash management system (the "Cash Management System"), which includes all activities necessary

and pertinent to collecting and disbursing cash assets.[8]  The Cash Management System allows

USA Discounters to efficiently identify its cash requirements and transfer cash as needed to

respond to these requirements.

104.    The Cash Management System generally operates similarly to the centralized cash

management systems used by other companies to manage the cash of numerous operating units

in a cost-effective, efficient manner.  A chart depicting the flow of funds in the Cash

Management System is attached to the Cash Management Motion as Exhibit B.  The Cash

Management System consists of bank accounts (the "Bank Accounts"), which are maintained at

Wells Fargo Bank, N.A. ("Wells Fargo").  Exhibit C to the Cash Management Motion contains a

list of all of the Debtors' Bank Accounts.

105.    *Store Collections.*  Cash collections from brick and mortar sales are deposited

directly into accounts maintained by USA Discounters at Wells Fargo (the "Store Depository

Accounts").  Stores typically make deposits into the Store Depository Accounts on a daily basis.

USA Discounters maintains seven Store Depository Accounts with Wells Fargo, which are set up

as zero balance accounts that are swept daily.  USA Discounters initiates daily transfers from the

Store Depository Accounts to a master depository account maintained by USA Discounters at

Wells Fargo (the "Master Depository Account").  USA Discounters also maintains an ACH

account for certain store and receivables collections (the "Master ACH Account").  The Master

Depository Account and Master ACH Account are then swept daily into a cash concentration

account maintained by USA Discounters at Wells Fargo (the "Master CCA Account").  The

proceeds from brick and mortar credit card sales and other miscellaneous checks and wires are

deposited by the third-party processors of those credit card or check transactions, net of certain

---

[8]    As of the Petition Date, Holdings and Credit LLC were in the process of establishing separate deposit accounts
at Wells Fargo Bank, N.A, and  $5,000 for each account has been transferred to Wells Fargo Bank, N.A.

customer returns, chargebacks, and fees, directly into the Master ACH Account and are then swept daily into the Master CCA Account as described above.

106.   *Receivables Collections*.  Cash collections of Receivables are completed both at stores and by the finance department.  Store collections of Receivables include check, cash, credit, and debit transactions, which are deposited daily into the Store Depository Accounts, and then swept daily into the Master Depository Account as described above.  Finance department collections of Receivables include ACH, debit, credit, and check by phone, which are deposited directly into the Master ACH Account, and cash transactions, which are deposited directly into the Master Depository Account.  USA Discounters also receives collections via checks from bankruptcy courts, garnishments from the department of defense, and third party collections, which collections are deposited directly into the Master Depository Account.  All collections are then swept daily from the Master ACH Account and the Master Depository Account into the Master CCA Account.

107.   In connections with its store and receivables collections efforts, USA Discounters engages various service providers described in the Cash Management Motion, including, without limitation, (i) Brink's Inc. ("Brinks"), (ii) TeleCheck, (iii) First Data, (iv) Authorize.Net, (v) PaySimple, and (vi) Billing Tree (collectively, along with other similar service providers used in the ordinary course to facilitate collections, the "Collections Processing Vendors").  The services provided by the Collections Processing Vendors facilitate USA Discounters' store and Receivables collection efforts.  Accordingly, USA Discounters seeks authority to continue to pay postpetition costs of the Collections Processing Vendors in the ordinary course during the pendency of these Cases.

108.     Several of USA Discounters' deposit accounts are subject to Deposit Account

Control Agreements between (i) USA Discounters, (ii) Wells Fargo, as Prepetition Agent, and

(iii) Wells Fargo, as USA Discounters' banking institution (as amended, the "Deposit Account

Control Agreements").  USA Discounters intends to maintain the Deposit Account Control

Agreements and any other agreements related to the subject accounts in the ordinary course of its

business and intends that they should govern the postpetition cash management relationship

between USA Discounters and Wells Fargo.

109.     *Disbursements Process.*  USA Discounters funds one standalone disbursement

account held in its name (the "Disbursement Account") each business day in order to pay checks

that have been presented that day for payment.  On a daily basis, USA Discounters automatically

sweeps funds from the Master Depository Account into the Master CCA Account, which then

funds the Disbursement Account, so as to ensure, on each business day, that there are sufficient

collected and available funds in each Disbursement Account in the amount of all items drawn on

such account, whether outstanding or presented for payment, and any other debit transactions

initiated with respect to such Disbursement Account.  USA Discounters makes disbursements

from the Disbursement Accounts directly to third parties.  USA Discounters also maintains a

separate account at Wells Fargo to fund tax related disbursements (the "Tax Account").  The

Master ACH Account, Master CCA Account, and the Tax Account are used to make

disbursements for payroll and payroll taxes (paid bi-weekly), non-payroll items relating to

employee health benefits and insurance (generally paid monthly), vendor payments (paid each

day based on terms with vendors), lease payments (paid monthly), sales taxes (generally paid

monthly, quarterly, or annually), and other expenditures as they come due.

110.    In light of the nature of USA Discounters' operations, I believe that it is critical that USA Discounters continue to utilize the existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**E.    Taxes Motion.**

111.    In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use, personal property, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the sale of their products or services at store locations.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtors estimate that they owe approximately $191,207 in unremitted Taxes and Fees, all of which is comprised of current tax obligations.

112.    Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the Taxes Motion.  I believe that payment of the Taxes and Fees is in the best interest of the Debtors and their estates, and may reduce harm and administrative expense to the Debtors' estates.

**F.    Utilities Motion.**

113.    In connection with the operation of its business and management of its properties, USA Discounters obtains electricity, natural gas, telephone, water, waste disposal, and other

similar services (collectively, the "Utility Services") from several utility companies or brokers

(collectively, the "Utility Companies"). A nonexclusive list of the Utility Companies and their

affiliates that provide Utility Services to USA Discounters as of the Petition Date is attached to

the Utilities Motion as Exhibit C.

114.    Uninterrupted Utility Services are essential to USA Discounters' ongoing

business operations and the overall success of these Cases. USA Discounters' operations require

electricity and gas for lighting, heating, and air conditioning. In addition to still operating seven

"Fletcher's Jewelers" retail stores, USA Discounters maintains a corporate office in Norfolk,

Virginia, which is responsible for ensuring the smooth operations of the USA Discounters'

nationwide business. USA Discounters' corporate office thus requires Utility Services such as

telephone, internet, water, and waste disposal services to operate. Should any Utility Provider

refuse or discontinue service, even for a brief period, USA Discounters' business operations

could be severely disrupted.

115.    On average, USA Discounters expects to pay approximately $72,659.94 each

month for third party Utility Services in respect of USA Discounters' remaining stores and other

locations. In the aggregate, the Utility Companies currently hold $1,018.25 in deposits from

USA Discounters.

116.    For the reasons already set forth herein and in the Utilities Motion, the relief

requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the

Debtors, for USA Discounters to operate its business without interruption, and to preserve value

for the Debtors' estates.

**G.      Insurance Motion.**

117.    In connection with their business operations, the Debtors maintain multiple

insurance policies (each an "Insurance Policy" and, collectively, the "Insurance Policies"). The

Insurance Policies vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations.  The Insurance Policies include (i) property, (ii) commercial general liability, (iii) auto, (iv) umbrella, (v) jewelers block, (vi) executive risk, (vii) cyber security, and (viii) employed lawyers.

118.    The total annual premiums under the current Insurance Policies are approximately $425,000.  These premiums are paid to the relevant insurance carriers (collectively, the "Insurance Carriers") either as annual prepayments or as installment payments.  The estimated prepetition amount owing to the Insurance Carriers is $0.

119.    In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from Willis Group.  Willis Group assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the procurement and negotiation of the Insurance Policies, and enabling the Debtors to obtain those policies on advantageous terms and at competitive rates.  Historically, the Debtors have indirectly paid (through the Insurance Carriers, from which Willis Group receives commissions directly) Willis Group approximately $71,000 in the aggregate on an annual basis for their services (the "Brokerage Fees").  As of the Petition Date, the Debtors believe that they do not owe any amounts in respect of Brokerage Fees.

120.    The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.  Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee.  If the Debtors fail to perform their

obligations under the Insurance Policies, their coverage thereunder could be voided. The Debtors may also need to renew or replace certain of the Insurance Policies during the course of these Cases, or enter into new policies. If the Debtors do not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

121.    For the reasons already set forth herein and in the Insurance Motion, the relief requested in the Insurance Motion is necessary to avoid harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**H.      Customer Programs Motion.**

122.    In the ordinary course of business, USA Discounters provides customers with certain customer-related programs as described in the Customer Programs Motion (the "Customer Programs") that engender goodwill, maintain loyalty, increase USA Discounters' sales opportunities, and allow USA Discounters a comparative advantage over its competition. Specifically, the Customer Programs relate to USA Discounters' programs by which it offers coupons, and other promotional offers to its customers, as well as processing customer purchases through the use of credit cards. USA Discounters believes that its ability to continue the Customer Programs and to honor its obligations thereunder in the ordinary course of business is necessary to (i) retain its reputation for reliability, (ii) meet competitive market pressures, (iii) maintain positive customer relationships, and (iv) ensure customer satisfaction, all of which will maximize the probability that payments will be made to USA Discounters in accordance with the Customer Contracts.

123.    As described more fully in Part I.B.3 above, in addition to goods, USA Discounters historically offered to sell its products with Warranties. USA Discounters stopped selling Warranties for new customers in April 2015 (pre-existing customers were permitted to

utilize the "add-on" program described above until that program was discontinued with the closure of the remaining "USA Living" stores), but seeks authority to continue to honor its outstanding Warranties during these Cases. Performance of USA Discounters' obligations under the Warranties is critical to preserving the value of the Debtors' estates because it is likely that customers will attempt to cease making payments on their Customer Contracts if the applicable Warranties are not honored.

124.    The methods through which USA Discounters intends to honor the Warranties during these Cases and notwithstanding the contemplated store closures include (i) continuing to provide a call center at which customers can obtain authorizations for repairs and other information, (ii) directing customers to manufacturers or designated service centers for repairs (either in person or via the mail), (iii) providing other alternatives to repair or replace the item, and (iv) negotiating other consensual resolutions with individual customers.

125.    In connection with honoring the Warranties, USA Discounters from time to time owes amounts to third-party service providers, such as service centers that repair items covered by a Warranty (the "Warranty Service Providers"). Consistent with its intent to honor the Warranties during these Cases, USA Discounters intends to make payments to the Warranty Service Providers in the ordinary course of business. As of the Petition Date, USA Discounters is not aware of outstanding amounts owed to any Warranty Service Providers. Nevertheless, some Warranty Service Providers will provide invoices on a delayed or arrears basis. Thus, in an abundance of caution and in order to ensure that USA Discounters can continue to honor the Warranties, including obtaining any necessary repairs or similar services from Warranty Service Providers, USA Discounters requests authority to pay prepetition amounts that may be owed to any Warranty Service Providers, but not to exceed $50,000 in the aggregate.

126.    In certain states in which USA Discounters does business, it is required by law to purchase bonds, set aside cash reserves, establish certificates of deposit, and/or establish and fund escrow accounts to ensure that USA Discounters is able to satisfy its potential obligations under the Warranties.  USA Discounters has purchased outstanding bonds in favor of the states of Georgia, Oklahoma, Texas, and Virginia (in the amounts of $100,000, $50,000, $100,000, and $100,000, respectively) from the Platte River Insurance Company.  The annual cost to renew these bonds is approximately $7,000.  The bonds have been renewed for 2015.  Also, as required by law in Oklahoma and Texas, USA Discounters has also set aside separate cash reserve accounts with Wells Fargo in the amounts of approximately $237,560 and $514,510, respectively, to fund potential Warranty obligations.  Similarly, pursuant to California law, USA Discounters has funded an escrow account with Wells Fargo in the amount of approximately $113,236.  Finally, pursuant to Texas law, USA Discounters has established with Wells Fargo an interest-bearing time-deposit account, renewable every 90 days, the current principal balance of which is approximately $250,711.  USA Discounters seeks authority to continue to maintain, renew, or establish existing or new bonds, cash reserves, certificates of deposit, and escrow accounts in the ordinary course of business in order to comply with state laws governing the Warranties.

127.    In addition to Warranties, USA Discounters historically offered its customers the opportunity to buy debt cancellation contracts (the "Debt Cancellation Contracts").  The Debt Cancellation Contracts generally provide that the applicable customer's debt under its Customer Contract will be cancelled and forgiven in the event that (i) the product is destroyed by fire or natural disaster; (ii) the product is stolen; or (iii) the customer dies.  For installment contracts, the Debt Cancellation Contracts run through the term of the applicable installment contract, and the

cost of the Debt Cancellation Contract is included in the amount financed. For revolving contracts, the Debt Cancellation Contracts run from month-to-month and the cost of the same is calculated monthly and included on each month's invoice for the ensuing month's coverage. USA Discounters stopped offering Debt Cancellation Contracts for new customers in April 2015. Customers with existing Debt Cancellation Contracts were permitted to renew them in connection with any new purchases made between April 2015 and the closure of the remaining "USA Living" stores.

128.    As of August 1, 2015, there were approximately 19,722 open Debt Cancellation Contracts regarding installment contracts covering approximately $79,154,115 worth of gross debt. As of July 31, 2015, USA Discounters had established an accounting reserve for Receivables write-offs under the Debt Cancellation Contracts of approximately $3.2 million, which is an estimate based on historical rates of debt forgiveness under the Debt Cancellation Contracts. Performance of USA Discounters' obligations under the Debt Cancellation Contracts is critical to preserving the value of the Debtors' estates. If USA Discounters does not honor the Debt Cancellation Contracts, relationships with customers will be damaged, and it is possible that customers will attempt to cease making payments under their Customer Contracts.

129.    In addition to cash and allotment payments, USA Discounters accepts credit card payments. In such cases, USA Discounters receives the net customer payment less any chargebacks, returns and processing fees charged. The processing fees charged by each company vary, but are in the range of 1.6% - 2.96%. The fees that are owing to these credit card companies are set off from the funds that are remitted to USA Discounters on a monthly basis. Maintaining use of the credit cards is essential to preserving the value of the Debtors' estates because a substantial portion of USA Discounters' sales are made using credit cards. USA

Discounters seeks authority to, in its sole discretion, allow the credit card companies to continue

to process customer payments, including deducting chargebacks, returns, and processing fees in

the ordinary course of business.

130.    The Customer Programs are standard in the retail industry.  If USA Discounters is

unable to honor or continue the Customer Programs, its ability to collect its Receivables, conduct

further business, and generate sales will be severely hampered.  On the other hand, continuing to

administer their Customer Programs without interruption during the pendency of these Cases will

help preserve USA Discounters' customer relationships and goodwill, which will in turn allow

USA Discounters to maximize the value of its remaining Receivables, inventory, and other

assets.

131.    For the reasons already set forth herein and in the Customer Programs Motion, the

relief requested in the Customer Programs Motion is necessary to avoid immediate and

irreparable harm to the Debtors, for USA Discounters to operate its business without

interruption, and to preserve value for the Debtors' estates.

**I.      Lease Rejection Motion.**

132.    Prior to the Petition Date, USA Discounters effected the closure of all 24 of its

"USA Living" stores and all of its warehouse locations (collectively, the "Leased Premises" and

the landlords relating to such Leased Premises, the "Landlords").  These closures occurred in

three general waves.

133.    *First*, on or before June 30, 2015, USA Discounters surrendered 3 leases in

connection with the closure of 3 of its "USA Living" stores.[9]  USA Discounters has ceased

---

[9]    USA Discounters entered into the lease dated as of January 21, 2015 for the Leased Premises located at 2165 Cunningham Drive, Unit 2166, Hampton, Virginia, with the intention that this Leased Premises would replace the Leased Premises located at 451 Oriana Road, Newport News, Virginia, for store number 180 (the Oriana Road premises was being occupied on a month-to-month basis as a holdover tenant).  Subsequently, USA

operations at these Leased Premises, has no further use for these Leased Premises, and on or before June 30, 2015, USA Discounters irrevocably surrendered each of these Leased Premises and abandoned any property remaining at these Leased Premises. In addition, since on or before June 30, 2015, the Landlords in respect of these Leased Premises have been in sole possession of these Leased Premises.

134.    *Second*, on or before July 31, 2015, USA Discounters surrendered 14 leases in connection with the closure of 14 more of its "USA Living" stores as well as 1 warehouse.[10] USA Discounters has ceased operations at these Leased Premises, has no further use for these Leased Premises, and on or before July 31, 2015, USA Discounters irrevocably surrendered each of these Leased Premises and abandoned any property remaining at these Leased Premises, other than property that did not belong to USA Discounters (such as certain leased photocopy machines). In addition, since on or before July 31, 2015, the Landlords in respect of these Leased Premises have been in sole possession of these Leased Premises.

135.    *Third*, on or before August 21, 2015, USA Discounters surrendered 7 leases in connection with the closure of its 7 remaining "USA Living" stores and 2 leases in connection with its 2 remaining warehouses. USA Discounters has ceased operations at these Leased Premises, has no further use for these Leased Premises, and on or before August 21, 2015, USA Discounters irrevocably surrendered each of these Leased Premises and abandoned any property remaining at these Leased Premises, other than property that did not belong to USA Discounters

---

Discounters instead decided to close store number 180 at the end of its then monthly term, not to replace it, and to irrevocably surrender the lease with respect to the Cunningham Drive premises. USA Discounters never occupied, and does not intend to occupy, the Leased Premises located at 2165 Cunningham Drive, Unit 2166, Hampton, Virginia, and, on or before June 30, 2015, USA Discounters irrevocably surrendered this lease to the respective Landlord.

[10]    The USA Living store and its associated warehouse in Colorado Springs, CO, were separate buildings but were incorporated into a single lease.

(such as certain leased copy machines).  In addition, since on or before August 21, 2015, the Landlords in respect of these Leased Premises have been in sole possession of these Leased Premises.

136.    The Debtors have provided sufficient notice to the Landlords of their irrevocable surrender of all the Leased Premises before the Petition Date.  First, on or before August 21, 2015, USA Discounters vacated each Leased Premises.  Second, on various dates on or before August 21, 2015, USA Discounters sent to each Landlord, via overnight Federal Express, a letter informing the Landlords that the letter served as written notice that USA Discounters thereby surrendered the Leased Premises and unequivocally and irrevocably delivered possession to the applicable Landlord effective as of the end of the day specified in the applicable letter.[11]  The letters also stated that USA Discounters had irrevocably abandoned and forfeited to the Landlords any and all property located in the Leased Premises ("Remaining Property").[12]  Finally, enclosed with each letter to the applicable Landlord were the keys for the respective Leased Premises, except with respect the Leased Premises located at 451 Oriana Road, Newport News, Virginia, for which the keys were previously turned over to the Landlord on June 26, 2015.

---

[11]    With respect to the Leased Premises for store number 105, located at 2770 Piney Green Road, Jacksonville, North Carolina, the lease, as amended by the First Lease Amendment dated as of September 15, 2013, provides for a month-to-month tenancy through and until June 30, 2015, at which point, absent continued occupancy by USA Discounters, the lease automatically terminates.  See First Lease Amendment § 5.  USA Discounters vacated and irrevocably surrendered this Leased Premises on or before June 30, 2015, thus the lease expired by operation of its own terms before the Petition Date.  Nevertheless, out of an abundance of caution, a letter unequivocally and irrevocably surrendering the Leased Premises was likewise sent to this Landlord, and the lease has been included among the Rejected Leases.

[12]    In some locations, the letters to such landlords indicated that leased copiers left behind were the property of Wells Fargo Capital Leasing.  The letters further provided point-of-contact information at the leasing company and stated that Wells Fargo Capital Leasing would be in touch with the landlord to retrieve the copiers.

137.    The Prepetition Agent has waived any rights it may have had in any Remaining Property as of the date and time of USA Discounters' abandonment and forfeiture thereof in favor of the Landlords.

138.    For the reasons already set forth herein and in the Lease Rejection Motion, the relief requested in the Lease Rejection Motion is necessary to avoid immediate and irreparable harm to the Debtors and to preserve value for the Debtors' estates.

**J.    Rejection Procedures Motion.**

139.    I believe that the procedures proposed in the Rejection Procedures Motion are tailored to minimize potential administrative expenses, maximize the recovery for creditors in these Cases, and, with respect to leases, return control of the affected premises to the applicable landlords as quickly as possible.

140.    In light of several contracts that the Debtors anticipate needing to reject during these Cases, the relief requested in the Rejection Procedures Motion is necessary to expedite the progress of these Cases, minimize administrative expenses, and avoid imposing an administrative burden on the Debtors' employees and professionals.

**K.    Section 156(c) Application.**

141.    Prior to the selection of Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from three claims and noticing agents to ensure selection through a competitive process.  I believe, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable.

142.    In view of the number of anticipated claimants and the complexity of the Debtors' business, I believe that the appointment of KCC as claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

## III.

## CONCLUSION

143.    The Debtors' ultimate goal in these Cases is to wind down USA Discounters' business and assets in a fashion that maximizes the value of the Debtors' estates for the benefit of all the respective Debtors' stakeholders.  In the immediate term, however, in order to minimize any loss of value during these Cases, the Debtors' most pressing objective is to minimize the disruption to USA Discounters' operations to the greatest extent possible as it enters chapter 11.  The Debtors believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving this objective and, in turn, their overriding goal in these Cases, will be substantially increased.


Executed this 24th day of August, 2015, at Norfolk, Virginia.


USA Discounters, Ltd., *et al.*,
Debtors and Debtors in Possession

By: _____
Timothy Y. Dorsey
Vice President