# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| USA DISCOUNTERS, LTD., *et al.*,[1] | Case No. 15-11755 (___) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING CONTINUED USE OF CASH MANAGEMENT SYSTEM, (II) AUTHORIZING USE OF PREPETITION BANK ACCOUNTS, ACCOUNT CONTROL AGREEMENTS, AND CERTAIN PAYMENT METHODS, AND (III) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b) ON AN INTERIM BASIS

USA Discounters, Ltd. ("USA Discounters"), USA Discounters Holding Company, Inc. ("Holdings"), and USA Discounters Credit, LLC ("Credit LLC" and, collectively with USA Discounters and Holdings, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of an order substantially in the form annexed hereto as **Exhibit A**, pursuant to sections 105, 345, 363, 364(b), and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing USA Discounters' continued use of its existing cash management system and related vendors, (ii) authorizing USA Discounters to continue using prepetition bank accounts and account control agreements, and using debit, wire, and ACH payments, and (iii) waiving the

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: USA Discounters, Ltd. (5123); USA Discounters Holding Company, Inc. (8192); and USA Discounters Credit, LLC (3128).  The Debtors' address is 6353 Center Drive, Building 8, Suite 101, Norfolk, Virginia, 23502.

requirements of Bankruptcy Code section 345(b) on an interim basis.  In support of the Motion, the Debtors rely on the *Declaration of Timothy W. Dorsey in Support of First Day Motions* (the "Dorsey Declaration") concurrently filed herewith.  In further support of the Motion, the Debtors respectfully represent as follows:

## I. JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory and legal predicates for the relief requested herein are sections 105, 345, 363, 364(b), and 503(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2.

## II. BACKGROUND

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

5.      The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no statutory committee has been appointed in these Cases.

2

6.     As of the Petition Date, USA Discounters is engaged in the retail business and operates seven retail stores located in five different states, all of which use the "Fletcher's Jewelers" brand.  USA Discounters' business operations previously included twenty-four other retail stores using the "USA Living" brand, which sold electronics, appliances, furniture, and other consumer products, but all of the "USA Living" stores were closed in the months preceding the Petition Date.

7.     USA Discounters' business was built on generating sales via consumer credit provided by USA Discounters through installment contracts or revolving contracts, with USA Discounters retaining and servicing the resulting customer receivables.  As of August 15, 2015, the outstanding aggregate principal balance of USA Discounters' receivables is approximately $114 million.  USA Discounters also sold warranty protection plans to cover defects associated with merchandise purchased from USA Discounters, with the warranty obligations typically running through the term of the corresponding installment credit contract.  USA Discounters' sale of warranties to new customers was discontinued in April 2015, and USA Discounters ceased selling goods on credit shortly before the Petition Date.  Although USA Discounters does not operate an e-commerce platform, it does maintain websites at which potential customers could preview products available for purchase at USA Discounters' stores (www.usaliving.com and www.fletchersjewelers.com).

8.     USA Discounters historically focused on serving members of the United States military and their families.  Due to various financial and regulatory changes within the military, military members and their families have decreased their spending on various consumer products, which has had a negative effect on USA Discounters' resulting revenues.

3

9.    The decline in the military member customer base coincides with increased challenges in the broader consumer retail space.  Indeed, over the past several months, several clothing stores and other retailers – including Deb Stores Holding LLC, dELiA*s, Inc., Caché, Inc., Simply Fashion Stores Ltd., RUUM American Kid's Wear, and Anna's Linens – have commenced bankruptcy cases for the specific purpose of liquidating their business operations. Several other retail businesses – including RadioShack Corporation – have used the bankruptcy process to effect going concern sales of certain core business operations, although after substantially reducing their retail footprints.

10.    In the face of this very challenging retail environment and external policy changes adversely affecting their business model, as well as defaults under USA Discounters' approximately $60 million secured credit facility (which matures in October 2015 in any event), the Debtors thoroughly considered the options available to maximize value for their stakeholders under the circumstances.  After determining that USA Discounters would be unable to refinance or extend its outstanding secured credit facility, and after being unable to locate a going-concern buyer for the entire business, the Debtors concluded that the optimal path forward is to conduct a structured and orderly wind down of USA Discounters' affairs under the auspices of chapter 11 bankruptcy cases.  The relief sought in this Motion is intended to preserve value and facilitate USA Discounters' operations through this process and into the next phases of these Cases.

11.    More detailed factual background regarding the Debtors and the commencement of these Cases is set forth in the Dorsey Declaration.

### III.  RELIEF REQUESTED

12.    By this Motion, the Debtors request that the Court enter an order, pursuant to Bankruptcy Code sections 105, 345, 363, 364(b), and 503(b), Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2, (i) authorizing USA Discounters' continued use of its existing cash

4

management system and related vendors, (ii) authorizing USA Discounters to continue using

prepetition bank accounts and account control agreements, and using debit, wire, and ACH

payments, and (iii) waiving the requirements of Bankruptcy Code section 345(b) on an interim

basis.

13.     In the ordinary course of its business, USA Discounters maintains a complex cash

management system (the "Cash Management System"), which includes all activities necessary

and pertinent to collecting and disbursing USA Discounters' cash assets.[2] The Cash

Management System allows USA Discounters to efficiently identify its cash requirements and

transfer cash as needed to respond to these requirements.  The Cash Management System is

important to the efficient execution and achievement of the Debtors' business objectives, and,

ultimately, to maximizing the value of the Debtors' estates.

14.     The Cash Management System generally operates similarly to the centralized cash

management systems used by other companies to manage the cash of numerous operating units

in a cost-effective, efficient manner.  A chart depicting the flow of funds in the Cash

Management System is attached hereto as **Exhibit B**.

15.     The Cash Management System consists of bank accounts (the "Bank Accounts"),

which are maintained at Wells Fargo.  **Exhibit C** contains a list of all of the Debtors' Bank

Accounts.

**A.     Collections Process**

16.     In connection with the maintenance of the Cash Management System and to

ensure effective collections efforts, USA Discounters engages various service providers, as

described below, including, without limitation, (i) Brink's, Inc., (ii) Telecheck, (iii) First Data,

---

[2]  As of the Petition Date, Holdings and Credit LLC were in the process of establishing separate deposit accounts at Wells Fargo Bank, N.A, and  $5,000 for each account has been transferred to Wells Fargo Bank, N.A.

(iv) Authorize.Net, (v) PaySimple, and (vi) Billing Tree (collectively, along with other similar service providers used in the ordinary course to facilitate collections, the "Collections Processing Vendors"). The services provided by the Collections Processing Vendors are necessary to ensure smooth operation of USA Discounters' store and Receivables collection efforts set forth below. Accordingly, USA Discounters seeks authority to continue to pay postpetition costs of the Collections Processing Vendors in the ordinary course during the pendency of these Cases.

17.    Store Collections. Cash collections from brick and mortar sales are deposited directly into accounts maintained by USA Discounters at Wells Fargo (the "Store Depository Accounts"). Stores typically make deposits into the Store Depository Accounts on a daily basis. USA Discounters maintains seven Store Depository Accounts with Wells Fargo, which are set up as zero balance accounts that are swept daily. USA Discounters initiates daily transfers from the Store Depository Accounts to a master depository account maintained by USA Discounters at Wells Fargo (the "Master Depository Account"). USA Discounters also maintains an ACH account for certain store and receivables collections (the "Master ACH Account"). The Master Depository Account and Master ACH Account are then swept daily into a cash concentration account maintained by USA Discounters at Wells Fargo (the "Master CCA Account"). The proceeds from brick and mortar credit card sales and other miscellaneous checks and wires are deposited by the third-party processors of those credit card or check transactions, net of certain customer returns, chargebacks, and fees, directly into the Master ACH Account  and are then swept daily into the Master CCA Account as described above.

18.    USA Discounters engages the services of Brink's Inc. ("Brinks") with respect to one Store Depository Account in San Antonio, Texas. Brinks performs weekly cash pickups from the store to the Wells Fargo branch, for a monthly fee of $100. USA Discounters also uses

6

the services of TeleCheck provided by First Data to provide check guarantees at the remaining

seven "Fletcher's Jewelers" store locations, at a cost of $350 per month. The services of Brinks

and First Data described herein are necessary to ensure the smooth operation of ongoing store

collections. USA Discounters seeks authority to continue to pay postpetition costs for these

services in the ordinary course during the pendency of these Cases.

19.     With respect to credit card transactions for both store and receivables collections,

USA Discounters uses the services of (i) First Data to process all merchant credit card

transactions, at a monthly cost of 2% of credit card sales, and (ii) Authorize.Net as the gateway

provider for all credit card transactions, at a monthly cost of $3,100. The services provided by

First Data and Authorize.Net facilitate the receipt of a material portion of USA Discounters'

revenues. Accordingly, USA Discounters seeks authority to continue to pay postpetition costs of

such monthly processing fees to First Data and Authorize.net in the ordinary course during the

pendency of these Cases.

20.     <u>Receivables Collections</u>. Cash collections of Receivables are completed both at

stores and by the finance department. Store collections of Receivables include check, cash,

credit, and debit transactions, which are deposited daily into the Store Depository Accounts, and

then swept daily into the Master Depository Account as described above. Finance department

collections of Receivables include ACH, debit, credit, and check by phone payments, which are

deposited directly into the Master ACH Account, and cash transactions, which are deposited

directly into the Master Depository Account. USA Discounters also receives collections via

checks from bankruptcy courts, garnishments from the department of defense, and third party

collections, which collections are deposited directly into the Master Depository Account. All

collections are then swept daily from the Master ACH Account and the Master Depository Account into the Master CCA Account.

21.      USA Discounters uses the services of (i) PaySimple to process ACH collections in respect of receivables, at a monthly cost of $1,200, and (ii) Billing Tree as the gateway provider for new credit card transactions in respect of receivables, at a monthly cost of $30 plus a $.30 per transaction fee.  The services provided by PaySimple and Billing Tree facilitate the collections of valuable receivables.  Accordingly, USA Discounters seeks authority to continue to pay postpetition costs of such monthly processing fees to PaySimple and Billing Tree in the ordinary course during the pendency of these Cases.

22.      Several of USA Discounters' deposit accounts are subject to Deposit Account Control Agreements between (i) USA Discounters, (ii) Wells Fargo, as Prepetition Agent, and (iii) Wells Fargo, as USA Discounters' banking institution (as amended, the "Deposit Account Control Agreements").  USA Discounters intends to maintain the Deposit Account Control Agreements and any other agreements related to the subject accounts in the ordinary course of its business and intends that they should govern the postpetition cash management relationship between USA Discounters and Wells Fargo.

23.      USA Discounters also maintains escrow accounts related to warranty reserves, some or all of which accounts are required by state law (the "Reserve Accounts").

**B.      Disbursements Process**

24.      USA Discounters funds one standalone disbursement account held in its name (the "Disbursement Account") each business day in order to pay checks that have been presented that day for payment.  On a daily basis, USA Discounters automatically sweeps funds from the Master Depository Account into the Master CCA Account, which then funds the Disbursement Account, so as to ensure, on each business day, that there are sufficient collected and available

8

funds in the Disbursement Account in the amount of all items drawn on such account, whether outstanding or presented for payment, and any other debit transactions initiated with respect to such Disbursement Account. USA Discounters makes disbursements from the Disbursement Accounts directly to third parties. USA Discounters maintains an additional account at Wells Fargo to fund tax related disbursements (the "Tax Account"). The Master ACH Account, Master CCA Account, and the Tax Account are used to make disbursements for payroll and payroll taxes (paid bi-weekly), non-payroll items relating to employee health benefits and insurance (generally paid monthly), vendor payments (paid each day based on terms with vendors), lease payments (paid monthly), sales taxes (generally paid monthly, quarterly, or annually), and other expenditures as they come due.

**C.     Allotment Processing**

        25.     As set forth in the Dorsey Declaration, USA Discounters receives a large percentage of its revenues through the "allotment" system established by the Department of Defense. An allotment occurs when the military or civil service employers automatically deduct money from an individual's military paycheck and pays it to a third party, often in satisfaction of a debt obligation. The use of allotments is generally subject to the discretion and consent of the affected military service member, although a process does exist (and is used by USA Discounters as one of its debt collection methods) to obtain involuntary allotments to satisfy judgments for commercial indebtedness. The allotment system is subject to detailed regulatory requirements pursuant to the Department of Defense's Financial Management Regulation (DoD 7000.14-R, Volume 7A, Chapters 40 and 42, *available at* http://comptroller.defense.gov/FMR.aspx).

        26.     Allotment payments to USA Discounters are processed through FirstNet, which is the bill payment services division of First Citizens Bank, and through the Defense Finance and Accounting Service, which was created by the Department of Defense in 1991 to standardize,

9

consolidate, and improve accounting and financial functions throughout the department. FirstNet charges each consumer a fee of $2.00 per month to process the consumer's payments through allotment. The consumers generally set up an allotment to deduct from their monthly pay an amount that is $2 more than the required monthly payment to USA Discounters. Each month, FirstNet retains its $2 fee, then remits to USA Discounters the customer's scheduled monthly payment amount. Contracts governed by Colorado law are an exception to this general process. Because of the peculiarities of Colorado law, USA Discounters – not the customer – pays the $2 processing fee to FirstNet. FirstNet invoices USA Discounters each month for the prior month's processing fees associated with Colorado contracts. In total, USA Discounters pays approximately $1,500 per month in processing fees to FirstNet for Colorado account processing. USA Discounters seeks authority to continue paying such monthly processing fees, as FirstNet's payment processing facilitates the receipt of a material portion of USA Discounters' revenues.

27.     The Debtors seek authority to continue using the Cash Management System, including the maintenance of the Debtors' existing Bank Accounts described above and in **Exhibits B** and **C** after the Petition Date, subject to their right to close certain accounts in their discretion and in accordance with any approved postpetition financing.

### IV.  BASIS FOR RELIEF

**A.     Maintaining the Existing Cash Management System is Important to the Debtors' Ongoing Operations and Restructuring Efforts**

28.     In light of the size and complexity of the Debtors' operations, the maintenance of the current Cash Management System is important for the preservation and enhancement of the value of the Debtors' estates.

DOCS_DE:201422.1 88601/001

29.    The Debtors' request for authorization to continue to use the Cash Management System is consistent with section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1).  Section 363(c)(1) is intended to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business.  *See, e.g., In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007).  Included within the purview of section 363(c) is a debtor's ability to continue the routine transactions necessitated by its cash management system.  *See Amdura Nat'l Distrib. Co. v. Amdura Corp. (In reAmdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).  Nevertheless, the Debtors bring this Motion out of an abundance of caution, to the extent any aspect of the Cash Management System could be considered as outside the ordinary course of business for purposes of section 363(c).

30.    Courts in this and other districts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *rev'd on other grounds*, 997 F.2d 1039 (3d Cir. 1993); *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").  The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1061 (3d Cir. 1993).  For these reasons, USA Discounters should be permitted to continue to use its Cash Management System.

B.   **The Court Should Authorize the Debtors to Maintain Existing Bank Accounts and Continue to Use their Existing Check Stock**

31.     The United States Trustee for the District of Delaware has set forth certain operating and reporting requirements for chapter 11 cases (the "U.S. Trustee Guidelines") that require debtors in possession to, among other things: (a) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, and to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

32.     Enforcement of the U.S. Trustee Guidelines during these Cases would severely disrupt the Debtors' ordinary financial operations. Accordingly, the Debtors respectfully request that the Court allow them to operate each of the Bank Accounts as such were maintained in the ordinary course of business before the Petition Date.

33.     In addition, the Debtors have concurrently filed several motions seeking authorization to pay prepetition obligations in the ordinary course of business. If the Debtors were required to open new accounts, they would likely be unable to timely implement the critical relief sought in those motions. The Debtors have the ability to monitor disbursements from the Debtors' Bank Accounts to ensure that only those prepetition obligations expressly approved by this Court are paid.

12

34.     In the ordinary course of business, the Debtors use certain pre-printed check stock.  To avoid disruption of the Cash Management System and unnecessary expense, pursuant to Local Rule 2015-2(a), the Debtors request that the Debtors be authorized to continue to use their existing check stock, without reference to its status as a debtor in possession.  The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their existing checks.  The Debtors will be sending a notice of commencement of these chapter 11 Cases to all creditors.  Most parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession; thus, changing checks immediately is unnecessary and unduly burdensome.

35.     Courts in this District have granted substantially similar relief in other chapter 11 cases.  *See, e.g.*, *In re The Wet Seal, Inc.*, No. 15-10081 (CSS) (Bankr. D. Del. Feb. 5, 2015); *In re Brookstone Holdings Corp*, No. 14-10752 (BLS) (Bankr. D. Del. Apr. 4, 2014); *In re F & H Acquisition Corp.*, No. 13-13220 (KG) (Bankr. D. Del. Dec. 17, 2013); *In re Overseas Shipholding Group, Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2013); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012); *In re THQ Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012); *In re Delta Petroleum Corp.*, No. 11-14006 (KJC) (Bankr. D. Del. Dec. 16, 2011).[3]  Accordingly, similar authorization is likewise appropriate in these chapter 11 Cases.

## C.     The Court Should Authorize the Debtors to Continue Using Debit, Wire and ACH Payments

36.     The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check.  In

---

[3]  Copies of these orders are available upon request, and have not been included because they are too voluminous.

particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH payments and other similar methods. If the Debtors' ability to conduct transactions by debit, wire, ACH payment, or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs. As such, the Debtors should be permitted to continue using debit, wire, and ACH payments.

**D.      The Court Should Authorize the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business**

37.      The Debtors respectfully request that the Court authorize the banks and financial institutions (the "Banks") at which the Bank Accounts are maintained to continue to maintain, service, and administer the Bank Accounts as accounts of debtors in possession, without interruption and in the ordinary course of business. In this regard, the Banks should be authorized and directed to receive, process, honor, and pay any and all checks, ACH payments and other instructions, and drafts payable through, drawn, or directed on the Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

38.      The Debtors further request that the Court authorize the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH payments should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH payments are dated before or after the Petition Date. The Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors; (b) in a good-faith belief that the

14

Court has authorized such prepetition check or item to be honored; or (c) as a result of an innocent mistake made despite the above-described protective measures, such Bank shall not be deemed to be liable to the Debtors or their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise. The Debtors further request that the Banks be authorized to (a) honor the Debtors' directions with respect to the opening and closing of any Bank Account, and (b) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; provided in each case that the Debtors' Banks shall not have any liability to any party for relying on such representations.

39.     Moreover, the Debtors request that the Court authorize (a) the Banks to charge, and the Debtors to pay or honor, both prepetition and postpetition service and other fees, costs, charges, and expenses to which the Banks are entitled under the terms and in accordance with their contractual arrangements with the Debtors, and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course.

**E.    Cause Exists for Waiving the Deposit and Investment Guidelines Under Section 345 of the Bankruptcy Code**

40.     Section 345(a) of the Bankruptcy Code authorizes such deposit or investment of the money of the estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Although section 345(a) generally requires that, with respect to deposits and investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must

15

require a bond in favor of the United States secured by the undertaking of a U.S. Trustee

approved corporate surety, the Court is permitted to dispense with this undertaking "for cause."

11 U.S.C. § 345(b).

     41.    The Court's ability to excuse strict performance of the requirements of section

345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy

Code. The legislative history of those amendments provides, in pertinent part, as follows:

> Section 345 of the Code governs investments of funds of
> bankruptcy estates. The purpose[] is to make sure that funds of a
> bankrupt that are obliged to creditors are invested prudently and
> safely with the eventual goal of being able to satisfy all claims
> against the bankruptcy estate. Under current law, all investments
> are required to be FDIC insured, collateralized or bonded. While
> this requirement is wise in the case of a smaller debtor with limited
> funds that cannot afford a risky investment to be lost, *it can work
> to needlessly handcuff larger, more sophisticated debtors.* This
> section would amend the Code to allow the courts to approve
> investments other than those permitted by section 345(b) for just
> cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 33
> F.3d 294 (3d Cir. 1994).

*In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. REP. NO.

103-835, at 46-47 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3355).

     42.    In determining whether the "cause" standard under section 345(b) of the

Bankruptcy Code has been met, courts consider a "totality of the circumstances analysis,"

utilizing the following factors: (a) the sophistication of the debtor's business; (b) the size of the

debtor's business operations; (c) the amount of the funds involved; (d) the bank ratings (Moody's

and Standard and Poor) of the financial institutions where the debtor in possession funds are

held; (e) the complexity of the case; (f) the safeguards in place within the debtor's own business

of insuring the safety of the funds; (g) the debtor's ability to reorganize in the face of a failure of

one or more of the financial institutions; (h) the benefit to the debtor; (i) the harm, if any, to the

estate; and (j) the reasonableness of the debtor's request for relief from the section 345(b)

requirements in light of the overall circumstances of the case. *Serv. Merch.*, 240 B.R. at 896.

43.     The Debtors believe they are in compliance with the requirements of section

345(a) because the Bank Accounts are maintained at U.S. Trustee-approved depository

institutions.  Nevertheless, out of an abundance of caution, the Debtors request (i) a waiver of the

deposit and investment requirements of section 345(b) of the Bankruptcy Code to the extent that

such requirements are inconsistent with the Debtors' current practices, (ii) that applicable

institutions be authorized and directed to accept and hold or invest such funds at the Debtors'

direction, and (iii) that applicable institutions be authorized and directed to honor the Debtors'

directions with respect to the opening and closing of any Bank Account.

44.     Even if the Debtors' current deposit and investment practices do not strictly

comply with the approved guidelines identified in section 345 of the Bankruptcy Code, the

practices nevertheless are prudent and designed to yield the maximum reasonable net return on

the funds invested, taking into account the safety of such deposits.

45.     In light of the foregoing, the Debtors submit that cause exists for waiver of the

requirements of Bankruptcy Code section 345(b) to the extent that those requirements are

inconsistent with the Debtors' current deposit and investment practices.  In accordance with

Local Rule 2015-2, the Debtors request interim waiver of the section 345 requirements for a

period of sixty (60) days from the Petition Date.

## V.  IMMEDIATE RELIEF IS NECESSARY

46.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be

granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P.

6003.  The Debtors submit that for the reasons already set forth herein, the relief requested in this

Motion is necessary to avoid immediate and irreparable harm to the Debtors.

17

## VI.  WAIVER OF ANY APPLICABLE STAY

47.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## VII.  NOTICE

48.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (iii) the Prepetition Agent; (iv) the Banks; and (v) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

18

## VIII.  CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Dorsey Declaration, the

Debtors respectfully request that this Court enter an order, substantially in the form attached

hereto, granting the relief requested in the Motion and such other and further relief as is just and

proper.

Dated:  August 24, 2015

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neil (DE Bar No. 4042)
Colin R. Robinson (DE Bar No. 5524)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:    (302) 652-4100
Fax:    (302) 652-4400
Email: ljones@pszjlaw.com
       joneil@pszjlaw.com
       crobinson@pszjlaw.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
Whitman L. Holt, Esq.
Sasha M. Gurvitz, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4023
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
       mtuchin@ktbslaw.com
       wholt@ktbslaw.com
       sgurvitz@ktbslaw.com

*[Proposed] Counsel to the Debtors and Debtors
in Possession*

DOCS_DE:201422.1 88601/001