## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>USA DISCOUNTERS, LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-11755 (___)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION EMPLOYEE CLAIMS, INCLUDING WAGES, SALARIES, EMPLOYEE AGREEMENT PAYMENTS, AND BONUSES, (II) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF REIMBURSEMENT TO EMPLOYEES FOR PREPETITION EXPENSES, (IV) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (V) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS AND THIRD PARTY PROVIDERS, AND (VI) ALLOWING BANKS TO HONOR PREPETITION CHECKS AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS**

USA Discounters, Ltd. ("USA Discounters"), USA Discounters Holding Company, Inc. ("Holdings"), and USA Discounters Credit, LLC ("Credit LLC"), the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of an order substantially in the form annexed hereto as **Exhibit A**, pursuant to sections 105(a), 363(b), 507(a), and 541 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (1) authorizing, but not directing, USA Discounters: (a) to pay accrued prepetition wages, salaries, and other amounts to its employees (the "Employees"); (b) to honor any

---

[1]  The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: USA Discounters, Ltd. (5123); USA Discounters Holding Company, Inc. (8192); and USA Discounters Credit, LLC (3128).  The Debtors' address is 6353 Center Drive, Building 8, Suite 101, Norfolk, Virginia, 23502.

prepetition obligations in respect of, and to continue to honor in the ordinary course of business until further notice (but not assume), certain of USA Discounters' vacation, paid time off, and holiday time policies,  workers' compensation and employee and retiree benefit plans and programs, and employee agreement payments as described below; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of USA Discounters in the ordinary course of business; (d) to remit all related prepetition payroll taxes and other deductions; and (e) to the extent that any of the foregoing programs is administered, insured, or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees; and (2) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.  In support of the Motion, the Debtors rely on the *Declaration of Timothy W. Dorsey in Support of First Day Motions* (the "Dorsey Declaration") concurrently filed herewith. In further support of the Motion, the Debtors respectfully represent as follows:

## I. JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent

2

consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a), and 541 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

## II. BACKGROUND

4.     On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

5.     The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no statutory committee has been appointed in these Cases.

6.     As of the Petition Date, USA Discounters is engaged in the retail business and operates seven retail stores located in five different states, all of which use the "Fletcher's Jewelers" brand.  USA Discounters' business operations previously included twenty-four other retail stores using the "USA Living" brand, which sold electronics, appliances, furniture, and other consumer products, but all of the "USA Living" stores were closed in the months preceding the Petition Date.

7.     USA Discounters' business was built on generating sales via consumer credit provided by USA Discounters through installment contracts or revolving contracts, with USA Discounters retaining and servicing the resulting customer receivables.  As of August 15, 2015, the outstanding aggregate principal balance of USA Discounters' receivables is approximately $114 million.  USA Discounters also sold warranty protection plans to cover defects associated with merchandise purchased from USA Discounters, with the warranty obligations typically running through the term of the corresponding installment credit contract.  USA Discounters'

3

sale of warranties to new customers was discontinued in April 2015, and USA Discounters ceased selling goods on credit shortly before the Petition Date.  Although USA Discounters does not operate an e-commerce platform, it does maintain websites at which potential customers could preview products available for purchase at USA Discounters' stores (www.usaliving.com and www.fletchersjewelers.com).

8.      USA Discounters historically focused on serving members of the United States military and their families.  Due to various financial and regulatory changes within the military, military members and their families have decreased their spending on various consumer products, which has had a negative effect on USA Discounters' resulting revenues.

9.      The decline in the military member customer base coincides with increased challenges in the broader consumer retail space.  Indeed, over the past several months, several clothing stores and other retailers – including Deb Stores Holding LLC, dELiA*s, Inc., Caché, Inc., Simply Fashion Stores Ltd., RUUM American Kid's Wear, and Anna's Linens – have commenced bankruptcy cases for the specific purpose of liquidating their business operations. Several other retail businesses – including RadioShack Corporation – have used the bankruptcy process to effect going concern sales of certain core business operations, although after substantially reducing their retail footprints.

10.      In the face of this very challenging retail environment and external policy changes adversely affecting their business model, as well as defaults under USA Discounters' approximately $60 million secured credit facility (which matures in October 2015 in any event), the Debtors thoroughly considered the options available to maximize value for their stakeholders under the circumstances.  After determining that USA Discounters would be unable to refinance or extend its outstanding secured credit facility, and after being unable to locate a going-concern

4

buyer for the entire business, the Debtors concluded that the optimal path forward is to conduct a structured and orderly wind down of USA Discounters' affairs under the auspices of chapter 11 bankruptcy cases. The relief sought in this Motion is intended to preserve value and facilitate USA Discounters' operations through this process and into the next phases of these Cases.

11.     More detailed factual background regarding the Debtors and the commencement of these Cases is set forth in the Dorsey Declaration.

## III. RELIEF REQUESTED

12.     By this Motion, the Debtors request that the Court enter an order authorizing, but not directing, USA Discounters, in its sole discretion: (a) to pay to the Employees all accrued prepetition wages, salaries, and other amounts described more fully below (collectively, the "Employee Claims"); (b) to honor any prepetition obligations in respect of, and to continue to honor in the ordinary course of business until further notice (but not assume), certain of USA Discounters' vacation, paid time off, and holiday time policies, workers' compensation and employee and retiree benefit plans and programs, and employee agreement payments (collectively, the "Employee Benefits"), as described below; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of USA Discounters in the ordinary course of business (the "Employee Expenses"); (d) to remit all related prepetition payroll taxes (the "Payroll Taxes") and other deductions (the "Employee Withholdings"); and (e) to the extent that any Employee Benefit is administered, insured, or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees (collectively with the Employee Claims, the Employee Benefits, the Employee

Expenses, the Payroll Taxes, and the Employee Withholdings, the "Prepetition Employee Obligations").

14.    The Debtors also request an order authorizing the Banks to honor and process checks and electronic transfer requests related to the foregoing.

**A.    Employee Claims: Wages, Salaries, Employee Agreement Payments, and Bonus Programs**

   **a.    Payroll and Ordinary Course Compensation**

15.    USA Discounters' workforce is comprised of full-time salaried employees, full-time hourly employees (collectively, the "Full Time Employees"), and regular part-time hourly employees ("Part Time Employees"). As of the Petition Date, USA Discounters employs approximately 127 hourly Full Time Employees and 27 salaried Full Time Employees, for a total of 154 Full Time Employees, and 8 Part Time Employees. The foregoing numbers reflect the reduction in force first implemented by USA Discounters in June 2015, and continuing thereafter, in connection with the initiation of a chain-wide inventory sales process, as discussed in greater detail below. All of USA Discounters' Employees are stationed either at the Debtors' Norfolk, Virginia headquarters or at one of USA Discounters' store locations.

16.    All Employees are paid bi-weekly on Fridays for the prior two weeks ending on the previous Saturday of any payroll week. Payroll to the Employees is funded in gross to Paylocity Web Pay ("Paylocity"), USA Discounters' third-party payroll administrator, one business day before each pay date, and Paylocity is responsible for distributing net pay to the Employees from its own accounts. USA Discounters' most recent prepetition payroll date was August 20, 2015. It covered the pay period from August 2, 2015 through August 15, 2015, and included amounts associated with terminating Employees who worked in the recently closed "USA Living" stores, warehoused, and the USA Discounters credit department. The total

amount of the August 20, 2015 payroll was approximately $756,000. USA Discounters' next scheduled payroll date is September 4, 2015, and will cover the pay period from August 16, 2015 through August 29, 2015. Consistent with the ordinary course of dealings between USA Discounters and Paylocity, funds in respect of this pay period have not yet been withdrawn from USA Discounters' accounts. USA Discounters expects that postpetition bi-weekly payroll expenses through the first three months of these Cases will be in the range of approximately $344,000 - $497,000, subject to any postpetition reduction in workforce.

17.     The Debtors' ability to maximize the value of the estates for all stakeholders depends on the expertise and continued enthusiasm and service of USA Discounters' Employees. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the Employees may be adversely affected, particularly in light of the largely wind-down nature of these particular Cases. If USA Discounters fails to pay the Employee Claims in the ordinary course, the Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses. This outcome would have a negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby causing immediate and irreparable harm to the Debtors and their estates.

18.     USA Discounters believes that, as of the Petition Date, approximately $230,000 was earned but remains unfunded with respect to Employees on account of accrued prepetition wages and salaries. Pursuant to this Motion, USA Discounters seeks to pay the outstanding amounts owed to Employees as of the Petition Date for accrued and unfunded wages and salaries, in an amount not to exceed $250,000 in the aggregate.

19.     In addition, USA Discounters occasionally contracts with additional workers, who are either independent contractors or employees leased from temporary placement agencies. As

7

of the Petition Date, there is one such additional worker. This individual is compensated outside of USA Discounters' payroll system, and receives, in the aggregate, approximately $1,000 per week. The additional worker is owed approximately $1,000 in respect of prepetition services.

20.     USA Discounters seeks to continue to pay postpetition costs of the Employee Claims in the ordinary course during the pendency of these Cases (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

21.     USA Discounters pays Paylocity approximately $3,000 per month for its administrative services (the "Paylocity Fee"). The Paylocity Fee is funded bi-weekly on the check date of each payroll for associated payroll costs. As of the Petition Date, USA Discounters believes that no amounts are owing in respect of the Paylocity Fee. Out of an abundance of caution, USA Discounters seeks authority to pay any prepetition amounts owing to Paylocity in respect of the Paylocity Fee in an amount not to exceed $500 in the aggregate. USA Discounters seeks authority to continue to make payments in respect of the Paylocity Fee postpetition in the ordinary course during the pendency of these Cases.

b.     **The Employee Agreements with Non-Insider Employees**

22.     In June 2015, USA Discounters entered into individual agreements with all of its non-insider Employees through forms of *Agreement and General Releases* (the "Employee Agreements") setting forth the expected timeframe on which each such Employee would continue to be employed by USA Discounters, and providing for payment terms for the Employee through that timeframe, including (in some instances) certain incentive and retention payments as more specifically set out below (the "Employee Agreement Payments"). The Employee Agreement Payments were designed to maintain morale and retain critical employees through the completion of the applicable phases of the wind-down process. USA Discounters

8

believed it was important to negotiate and execute these individualized agreements in light of the
Employee layoffs that had recently occurred and were expected to continue to occur as the wind-
down process unfolded. For example, in connection with the initiation of a chain-wide inventory
sales process on June 25, 2015, USA Discounters immediately terminated seven of its
Employees – one of whom worked in USA Discounters' stores, two of whom worked in USA
Discounters' credit department, and four of whom worked in USA Discounters' other corporate
departments. Subsequent Employee terminations have occurred as USA Discounters has
continued to sell inventory and close stores.

23.      The Employee Agreements entered into with certain critical non-insider
Employees provide for various Employee Agreement Payments depending on the function of
each respective Employee and the significance of the Employee's role in the successful
completion of the wind-down process. The Employee Agreement Payments provided for in the
various Employee Agreements are as follows:

a.      Store General Managers received an increase in their hourly pay rate and
are eligible for double sales commissions for sales from June 25, 2015
through the completion of the store sales process. Store General Managers
may also earn a bonus of $100 to $2,500 if they keep inventory losses (or
"shrink") within certain limits over the duration of the sales process (the
amounts vary based on the duration of the applicable store's sales process
and the amount of shrink). The total amount contemplated for "shrink"
prevention bonuses for these seven remaining Employees is estimated to
be approximately $14,000. Finally, Store General Managers are eligible
for a severance payment upon termination of their employment. The
double sales commissions, shrink bonus, and severance payment are
payable only if the Store General Manager works through his or her
respective expected store closure date.

b.      All other store-based, sales-related personnel received an increase in their
hourly rate and are eligible for double sales commissions for sales from
June 25, 2015 through the completion of the store sales process. The total
amount contemplated for sales commission bonuses for these
approximately 37 remaining Employees is estimated to be approximately

$215,579.[2] These Employees are also eligible for a severance payment upon termination of their employment. The double sales commissions and severance payment are payable only if the Employee works through his or her respective expected store closure date.

c.    Area Managers are eligible for a retention bonus. The retention bonus amounts range from $5,000 to $10,000 for each Area Manager based on the Area Manager's expected duration of continued employment with USA Discounters. The total amount contemplated for retention bonuses for all five remaining Area Managers is estimated to be approximately $30,000. Area Managers are also eligible for a severance payment upon termination of their employment. The retention bonus and severance payment are payable only if the Area Manager works through the completion of the store sales process (as the process and associated employment terms may be extended pursuant to footnote 2).

d.    Corporate personnel with expected termination dates within six months of the signing of the Employee Agreements ("Departing Corporate Employees") are eligible for a retention bonus. The retention bonus amounts range from $500 to $50,000 for each Departing Corporate Employee based on the Employee's anticipated impact on the business and expected duration of continued employment with USA Discounters. The total amount contemplated for retention bonuses for all Departing Corporate Employees is estimated to be approximately $105,900. Departing Corporate Employees are also eligible for a severance payment upon termination of their employment. The retention bonus and severance payment are payable only if the Departing Corporate Employee works through a specified date, which date varies based on job function. It is possible that USA Discounters may seek to extend the termination date for some of the Departing Corporate Employees. If any of these Employees are later offered continued employment beyond the date contemplated in his or her respective Employee Agreement, the Employee's retention bonus is immediately payable while the severance payment will not be payable until such time as the Employee is later terminated due to job elimination. Such offers for continued employment will also include a retention bonus at the rate of 25% of the Employee's annual compensation.

---

[2] The exact amount and timing of any commission payments will depend on the progress of inventory sales in the "Fletcher's Jewelers" stores. With respect to Store General Managers, Area Managers, and sales personnel at the remaining "Fletcher's Jewelers" stores, the Employee Agreements contemplated that these Employees would be terminated and eligible to receive any final Employee Agreement Payments as of September 30, 2015. In order to take advantage of potential sales opportunities through the holiday season, pursuant to the relief requested by the Employee Compensation and Benefits Motion, USA Discounters may, in its business discretion, offer an extension of the terms of these particular Employee Agreements that would involve the subject Employees remaining through December 31, 2015, with a continuing entitlement to the same hourly wages and commission payments otherwise applicable under their Employee Agreements, but USA Discounters would make the Employee Agreement Payments to which the subject Employee would otherwise be eligible on the originally-agreed September 30 date.

10

e.  Retained corporate, collections, and legal personnel are eligible for a retention bonus. The retention bonus amounts are generally set at the rate of 25% of the Employee's annual compensation (so, for example, Employees who will be retained for six months are eligible for a retention bonus equal to 12.5% of annual compensation, and those Employees who will be retained for one year are eligible for a retention bonus equal to 25% of annual compensation). The individual retention bonuses for these Employees range from $1,664 to $43,750. The total amount contemplated for retention bonuses for all these Employees is estimated to be approximately $778,321. These Employees are also eligible for a severance payment upon termination of their employment. The retention bonus and severance payment are payable only if the Employee works through a specified date. The Employee Agreements for these Employees contemplate terms through June 1, 2016 or December 31, 2015, depending on the particular Employee's job function. If any of these Employees are later offered continued employment beyond the date contemplated in his or her respective Employee Agreement, the Employee's retention bonus is immediately payable while the severance payment will not be payable until such time as the Employee is later terminated due to job elimination. Such offers for continued employment will also include a retention bonus at the rate of 25% of the Employee's annual compensation.

24.  In all cases, the amount of the severance payments contemplated by the Employee Agreements is calculated based on USA Discounters' historical formula of one week of severance pay for each full year of service by the subject Employee.[3] If all severance is payable, the total amount that has accrued and would be paid, over time, to all eligible Employees is $488,799. The approximate total amount of Employee Agreement Payments that is expected to be paid out to all Employees during the first 30 days of these Cases is $0 in the aggregate; the approximate total amount of Employee Agreement Payments that is expected to be paid out to all Employees during the subsequent 30 days of these Cases is $347,000 in the aggregate.

25.  The Employee Agreement Payments are specifically tailored to combat the rising attrition rate faced by USA Discounters in the wake of the ongoing store closures and the

---

[3] USA Discounters did not maintain a written severance pay policy for the majority of Employees generally. However, USA Discounters regularly provided severance payments to Employees when their positions were eliminated, typically on the basis of one week of pay for each year of service by the subject Employee. These historical practices were formalized in the Employee Agreements.

11

corresponding reductions in work force, and are designed to boost Employee morale and retain certain Employees who are critical to the successful completion of the wind-down process. As such, the Employee Agreement Payments are not a substitute for the Employee Bonus Programs (as defined below), which USA Discounters has historically maintained, including before the commencement of the inventory sales process. Accordingly, USA Discounters seeks authorization to continue to honor the Employee Agreements and to continue to pay postpetition costs of the Employee Agreement Payments in the ordinary course during the pendency of these Cases. To be clear, no Employee Agreement Payments to any insiders (as defined in section 101(31) of the Bankruptcy Code) are contemplated under the Employee Agreements, and no such payments will be made to any insiders unless separately authorized by the Court. Moreover, USA Discounters will only make postpetition payments under the Employee Agreements to Employees who are employed by USA Discounters on and after the Petition Date, since these Employees are continuing to work and rely on their Employee Agreements while conferring benefits on USA Discounters' bankruptcy estate from and after the Petition Date.

c.    **Other Employee Bonus Programs**

26.    In order to ensure optimal performance by the Employees, USA Discounters has historically implemented several bonus and incentive programs (collectively, the "Employee Bonus Programs"). The Employee Bonus Programs in effect are as follows:

a.    Sales personnel in the remaining "Fletcher's Jewelers" stores earn a four percent (4%) commission on sales of jewelry. The percentages used to determine amounts payable under this program were increased in connection with the applicable Employee Agreements described above.

b.    Store General Managers earn a monthly bonus of anywhere from .50% to a high of 1.5% of sales (the amounts vary based on the volume of store sales and the extent to which the budget is exceeded). The percentages used to determine amounts payable under this program were increased in connection with the applicable Employee Agreements described above.

c.    Recovery Collectors are eligible for a bonus as a percentage of payments received if they achieve their personal collections goal, and double that bonus if both their personal goal and their team's goal are achieved.

d.    Recovery Supervisors are eligible for a monthly or quarterly bonus if their team exceeds recoveries over the prior year, which bonuses range from $125.00 to $250.00 monthly bonus for one supervisor, and from $125.00 to $1,500.00 in quarterly bonuses for the remaining supervisors, depending on the amount by which the recoveries were exceeded over the prior year.

e.    Front End Collectors and their supervisors are eligible for a bonus based on how they placed in the pack of all collectors on payments received or delinquency cleared, which bonuses ranging from $100.00 to $400.00.

f.    From time to time, USA Discounters may implement additional bonus programs to encourage sales competition among stores, with the amount to any particular discretionary, one-time bonus program not to exceed $1,500 per individual.

27.    As of the Petition Date, USA Discounters estimates that $27,000 in the aggregate is owed to Employees in respect of prepetition obligations under the Employee Bonus Programs. USA Discounters seeks authorization to pay prepetition amounts in respect of the Employee Bonus Programs in an amount not to exceed $35,000 in the aggregate, and to continue to pay postpetition costs of the Employee Bonus Programs in the ordinary course during the pendency of these Cases, provided that no bonus or incentive payments will be made to any insiders (as defined in section 101(31) of the Bankruptcy Code) unless separately authorized by the Court.

**B.    Employee Benefits**

**a.    Vacation and Paid Time Off**

28.    *Vacation Time.*  Full Time Employees accrue vacation time ("Vacation") upon their anniversary date.  Vacation time for the majority of Employees is accrued based on years of service.  Full Time Employees with one to two years of service can earn up to five Vacation days, or 40 hours, per year.  Full Time Employees with three to four years of service can earn up to 10 Vacation days, or 80 hours, per year.  Finally, Full Time Employees with five or more

13

years of service can earn up to 15 Vacation days, or 120 hours, per year. In the event that Vacation is not used by the end of the benefit year, Full Time Employees are not paid for the unused Vacation time and the Vacation balance is reset to zero at the end of each Full Time Employee's anniversary year. For Full Time Employees in California, unused Vacation time instead carries over from year to year with a maximum Vacation accrual of 15 days, or 120 hours. Vacation pay is calculated based on an Employee's base hourly pay or base salary. At separation of employment, earned but unused Vacation is paid out to Full Time Employees.

29.     Certain high-level Employees are entitled to a set amount of Vacation time regardless of years of service, with each such agreement being negotiated at the time of hire. Typically, the Employee would be entitled to a full three weeks of Vacation time in his or her first year of employment without reference to the above described accrual schedule. At separation of employment, earned but unused Vacation is paid out to these high-level Employees.

30.     During the week of June 22, 2015, USA Discounters made payments of approximately $313,000 in the aggregate in order to cash all Employees out of their accrued Vacation and ensure that those Employees would not be absent from work during critical times in the wind-down process. Then, during the week of August 16, 2015, USA Discounters made further payments of approximately $86,000 in the aggregate in order to cash additional Employees out of the Vacation accrued through that period, once again to ensure that those Employees would not be absent from work in the coming weeks. As of the Petition Date, only one Employee had accrued and unused Vacation, which accrued and unused Vacation is in the amount of approximately $19,261. Should particular Employees later reach their respective anniversary date, additional Vacation may accrue.

14

31.     USA Discounters seeks authorization to continue the Vacation policy and to honor, in the ordinary course of business, all unused Vacation time accrued prior to the Petition Date, but not to make cash payments on account of accrued but unused Vacation time, except at separation of employment and where required by state law.

32.     Except as set forth in the following paragraph, the amount owed to any individual Employee on account of prepetition Employee claims for such Employee's accrued wages, severance, and Vacation does not exceed $12,475 and is not in respect of any time period more than 180 days before the Petition Date.

33.     Because of their long tenure with USA Discounters, nine non-insider Employees have prepetition claims that exceed $12,475 because of the amount of their accrued prepetition wages, Vacation, and/or severance.[4] USA Discounters does not seek authority to pay these Employees any amounts in excess of $12,475 on account of these prepetition claims.  One insider Employee also has prepetition claims that exceed $12,475 on account of accrued prepetition wages and severance.[5] USA Discounters does not seek authority to pay this Employee any amounts in excess of $12,475 on account of these prepetition claims (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

34.     *Paid Time Off.*  USA Discounters provides paid time off ("PTO") to all Full Time Employees for temporary absence due to illness, injuries, and other unanticipated matters. Eligible Employees accrue throughout the year on a pro-rata basis six PTO days, or 48 hours, per

---

[4]     The aggregate amounts of these non-insider Employees' prepetition claims are as follows: $36,347; $31,109; $27,693; $26,161 $21,779; $16,182;  $13,745; $13,077; $12,927.  These aggregate amounts exclude the amount of any retention payments payable under the Employee Agreements, as discussed more fully above.  Any payments made in respect of these aggregate claims will be applied first to prepetition wages, then to any accrued prepetition Vacation, and last to accrued severance.

[5]     The aggregate amount of this insider Employee's prepetition claim is $98,282.

twelve-month period, which period begins the first week of the month following the completion of the Employee's first 90 days of employment. For Employees in the District of Columbia, PTO instead begins to accrue upon the date of hire. Unused PTO may be carried over to the next twelve-month period, provided that Employees may only accrue a maximum of 30 PTO days, or 240 hours, at any point in time. Further, Employees are generally prohibited from using more than five PTO days, or 40 hours, at any given time. PTO pay is calculated based on an Employee's base hourly pay or base salary and payment is within the discretion of management. Full Time Employees are not paid for unused PTO days upon termination of employment or retirement, and USA Discounters therefore does not make any cash payments on account of the PTO policy if PTO days go unused. USA Discounters seeks authorization to continue the PTO policy during the pendency of these Cases and to honor, in the ordinary course of business, all unused PTO accrued prior to the Petition Date.

### b. Employee Benefit Plans

35.    Prior to the Petition Date, USA Discounters offered Full Time Employees various standard employee benefits (the "Benefit Programs") including, without limitation, (a) medical and prescription drug coverage, (b) dental insurance, (c) vision insurance, (d) COBRA coverage, (e) flexible spending accounts, (f) life insurance, (g) short-term and long-term disability insurance, and (h) certain paid holidays. Such benefits are administered pursuant to plans, programs, and policies that cover USA Discounters' Full Time Employees. The amounts set forth below reflect the approximate prepetition cost of such Benefit Programs, which USA Discounters seeks to continue in the ordinary course of its business. USA Discounters expects that Benefit Programs going forward will be consistent with the following, subject to any reduction in cost as a result of the reduced workforce.

36.     *Medical Insurance Program.*  USA Discounters offers a medical and prescription drug program (the "Health Plan") to Full Time Employees, which is administered by Anthem. The Health Plan is approximately 80% paid by USA Discounters and 20% paid by USA Discounters' Full Time Employees through payroll withholding.  For those Employees electing to cover their dependents, that portion attributable to coverage for such dependents is approximately 30% paid by USA Discounters and 70% paid by the Full Time Employee electing such coverage, which premiums are also paid by payroll withholding.  Payments in respect of Health Plan premiums are remitted in full by USA Discounters, and Employee contributions are subsequently recovered by USA Discounters during the payroll process.  The average monthly cost  to USA Discounters (without considering amounts paid from Employee withholding) of maintaining the Health Plan, has been approximately $100,224.  As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Health Plan, nevertheless out of an abundance of caution, USA Discounters seeks authorization to pay prepetition amounts in respect of the Health Plan in an amount not to exceed $20,000 in the aggregate.  USA Discounters seeks authorization to continue to pay postpetition costs of the Health Plan in the ordinary course during the pendency of these Cases.

37.     *Dental Insurance Program.*  USA Discounters offers a dental program (the "Dental Plan") to Full Time Employees, which is administered by Humana.  The Dental Plan is approximately 75% paid by USA Discounters and 25% paid by USA Discounters' Full Time Employees through payroll withholding.  Payments in respect of Dental Plan premiums are remitted in full by USA Discounters, and Employee contributions are subsequently recovered by USA Discounters during the payroll process.  The average monthly cost to USA Discounters (without considering amounts paid from Employee withholding) of maintaining the Dental Plan

has been approximately $4,311. As of the Petition Date, USA Discounters believes it owes no

amounts in respect of the Dental Plan, nevertheless out of an abundance of caution, USA

Discounters seeks authorization to pay prepetition amounts in respect of the Dental Plan in an

amount not to exceed $1,000 in the aggregate. USA Discounters seeks authorization to continue

to pay postpetition costs of the Dental Plan in the ordinary course during the pendency of these

Cases.

38.    *Vision Insurance Program.* USA Discounters offers vision insurance to Full

Time Employees through Humana (the "Vision Plan"). The Vision Plan is approximately 75%

paid by USA Discounters and 25% paid by USA Discounters' Full Time Employees through

payroll withholding. Payments in respect of Vision Plan premiums are remitted in full by USA

Discounters, and Employee contributions are subsequently recovered by USA Discounters

during the payroll process. The average monthly cost to USA Discounters (without considering

amounts paid from Employee withholding) of maintaining the Vision Plan has been

approximately $612. As of the Petition Date, USA Discounters believes it owes no amounts in

respect of the Vision Plan, nevertheless out of an abundance of caution, USA Discounters seeks

authorization to pay prepetition amounts in respect of the Vision Plan in an amount not to exceed

$200 in the aggregate. USA Discounters seeks authorization to continue to pay postpetition

costs of the Vision Plan in the ordinary course during the pendency of these Cases.

39.    *Life, Disability, and Related Insurance Coverage.* For Employees with specified

tenure, USA Discounters provides Full Time Employees with company-funded short-term and

long-term disability insurance, accidental death and dismemberment insurance, and basic life

insurance, which are all insured by Anthem (the "Life and Disability Plans"). USA Discounters

pays 100% of the costs of the Life and Disability Plans. In the aggregate, the average monthly

cost to USA Discounters of maintaining the Life and Disability Plans has been approximately $6,928. As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Life and Disability Plans, nevertheless out of an abundance of caution, USA Discounters seeks authorization to pay prepetition amounts in respect of the Life and Disability Plans in an amount not to exceed $1,500 in the aggregate. USA Discounters seeks authorization to continue to pay postpetition costs of the Life and Disability Plan in the ordinary course during the pendency of these Cases.

40.    *COBRA.* USA Discounters seeks to continue to perform in the ordinary course any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect of former Employees and their covered dependents. The former Employees pay 100% of the premiums for COBRA benefits, and USA Discounters therefore does not make any cash payments on account of COBRA benefits.

41.    *Supplemental Insurance.* USA Discounters offers Full Time Employees supplemental insurance administered by Aflac (the "Supplemental Insurance"). Employees pay 100% of the premiums for Supplemental Insurance via payroll withholding, and USA Discounters therefore does not make any cash payments on account of Supplemental Insurance.

42.    *Flexible Spending Accounts.* USA Discounters offers Full Time Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan and for dependent claims. The flexible spending benefits (the "Flex Benefits") are administered by Wage Works. USA Discounters has paid approximately $500 per month for administration of the Flex Benefits plans (the "Flex Benefits Fee"). As of the Petition Date, USA Discounters believes it owes no amounts in respect of the Flex Benefits Fee, nevertheless

19

out of an abundance of caution, USA Discounters seeks authorization to pay prepetition amounts in respect of the Flex Benefits Fee in an amount not to exceed $200 in the aggregate. USA Discounters seeks authorization to continue to pay postpetition costs of the Flex Benefits Fee in the ordinary course during the pendency of these Cases.

43.    *Paid Holidays.* USA Discounters offers paid holidays for Full Time Employees for six specified holidays (the "Paid Holidays"). Employees are paid eight hours for Paid Holidays if they do not work on such holiday, or are paid eight hours of pay on top of their earned wages if they do work on Paid Holidays (or, at their election, Employees may "bank" such eight hours as Vacation). As of the Petition Date, USA Discounters believes that no amounts are owed to Employees in respect of Paid Holidays (excluding any amounts earned for Paid Holidays that the Employee banked as Vacation, which amounts are instead included above as Vacation). USA Discounters seeks authorization to continue to pay postpetition costs of the Paid Holidays in the ordinary course during the pendency of these Cases.

44.    *Honoring of Prepetition Benefits.* As of the Petition Date, certain of the Benefit Programs described above may remain unpaid or not yet provided because certain obligations of USA Discounters under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of these Cases, but will not be required to be paid or provided in the ordinary course of USA Discounters' business until a later date. USA Discounters seeks authority to pay or provide as they become due all amounts in respect of the Benefit Programs described above that have already accrued, subject to the caps set forth herein.

45.    *Continuation of Benefit Programs Postpetition.* USA Discounters also requests confirmation of its right to continue to perform its obligations with respect to these Benefit Programs in the ordinary course for the duration of these Cases. These programs are an

20

important component of the total compensation offered to the Employees, and are essential to the

Debtors' efforts to maintain Employee morale and minimize attrition among those Employees

whose retention is important for the Debtors' success. The Debtors believe that the expenses

associated with honoring such programs are reasonable and necessary in light of the potential

attrition, loss of morale, and loss of productivity that would occur if such programs were

discontinued.

### c.    Workers' Compensation Program

46.    Under the laws of various states, USA Discounters is required to maintain

workers' compensation insurance to provide its Employees with coverage for injury claims

arising from or related to their employment with USA Discounters. USA Discounters maintains

a workers' compensation benefits program through Liberty Mutual Insurance (the "WC

Program"). The WC Program provides benefits to all of USA Discounters' Employees for

claims arising from or related to the Employee's employment with USA Discounters. The

annual premium for the WC Program is approximately $323,823. As of the Petition Date, USA

Discounters believes it owes no amounts in respect of the WC Program, nevertheless out of an

abundance of caution, USA Discounters seeks authorization to pay prepetition amounts in

respect of the WC Program in an amount not to exceed $20,000 in the aggregate. USA

Discounters seeks authorization to continue to pay postpetition costs of the WC Program in the

ordinary course during the pendency of these Cases.

### d.    Retirement Savings Program

47.    USA Discounters maintains a 401(k) plan (the "Retirement Plan"), administered

by John Hancock, through which qualified and participating Employees may defer a portion of

their salary to help meet their financial goals and accumulate savings for their future. The

Retirement Plan is funded by Employee contributions only, which are remitted to John Hancock

by Paylocity. USA Discounters believes that maintaining the Retirement Plan is important to
maintaining Employee morale.

48.    In connection with offering the Retirement Plan, USA Discounters pays
approximately $12,000 to a third party administrator for annual administration, compliance
testing, audit assistance, and preparation of the annual Form 5500 and required schedules. In
addition, USA Discounters pays approximately $8,000 each year for the audit of the Retirement
Plan. As of the Petition Date, USA Discounters believes it owes no amounts in respect of
administering the Retirement Plan, nevertheless out of an abundance of caution, USA
Discounters seeks authorization to pay prepetition amounts in respect of the Retirement Plan in
an amount not to exceed $2,500 in the aggregate. USA Discounters seeks authorization to
continue to pay postpetition costs of administering the Retirement Plan in the ordinary course
during the pendency of these Cases.

**C.    Employee Expenses**

49.    Prior to the Petition Date, USA Discounters directly or indirectly reimbursed
Employees for certain expenses incurred on behalf of USA Discounters in the scope of their
employment (the "Employee Expenses"). The Employee Expenses are incurred in the ordinary
course of USA Discounters' business operations and include, without limitation, expenses for
meals, travel, lodging, and other business-related expenses. Historically, approximately $30,000
has been paid by USA Discounters on account of Employee Expenses each month. Because a
delay often occurs between the time such expenses are incurred and the time an expense
reimbursement request is submitted, it is difficult to determine with precision the aggregate
amount of outstanding Employee Expenses. However, USA Discounters estimates that, as of the
Petition Date, approximately $5,000 in Employee Expenses remain unpaid. Additionally, USA
Discounters provides certain corporate Employees with "Pex Card" prepaid credit cards that the

applicable Employees use to pay for Employee Expenses in the ordinary course of business. Currently eighteen Employees hold Pex Cards. As of the Petition Date, the total amount funded to all Pex Cards is approximately $38,000 in the aggregate for all eighteen Employees.

50.    Absent authority to pay the Employee Expenses incurred prepetition, USA Discounters' Employees could be obligated to pay such amounts out of their personal funds, which would be unfair and would hurt morale. USA Discounters therefore seeks authority to pay outstanding prepetition Employee Expenses in an amount not to exceed $5,000 in the aggregate, and to continue the foregoing policy in the ordinary course during the pendency of these Cases.

**D.    Employee Withholdings and Payroll Taxes**

51.    USA Discounters' payroll administrator, Paylocity, routinely deducts certain amounts directly from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs, and other similar programs.

52.    USA Discounters deducts certain amounts from Employees' compensation that represent earnings that the Employees have designated for deduction for Supplemental Insurance and Flex Benefits (the "Employee Withholdings"). The amount deducted and remitted by USA Discounters in respect of Employee Withholdings is approximately $13,000 in the aggregate per month. In addition, USA Discounters is responsible for remitting to Paylocity, for its own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes"). USA Discounters has paid approximately $340,000 in the aggregate for employer-obligated Payroll Taxes each month. USA Discounters seeks authority to deduct and remit accrued but unfunded Employee

Withholdings, in an amount not to exceed $13,000 in the aggregate, and to remit Payroll Taxes, in an amount not to exceed $180,000 in the aggregate, and to continue to deduct and remit the Employee Withholdings and to remit the Payroll Taxes in the ordinary course during the pendency of these Cases.

**E.      Direction to Banks**

53.      Finally, USA Discounters seeks an order authorizing USA Discounters' banks to receive, process, honor, and pay all of USA Discounters' prepetition checks and fund transfers on account of any Prepetition Employee Obligations, and prohibiting USA Discounters' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations.  USA Discounters also seeks an order authorizing USA Discounters to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

**F.      Summary**

54.      USA Discounters seeks authority, but not direction, to continue to honor and implement the Employee-related policies and practices as described above and to pay Employee Prepetition Obligations in amounts not to exceed in the aggregate those set forth below, provided that, except as otherwise described herein, no individual Employee will be paid more than $12,475 in the aggregate with respect to prepetition accruals:

| | |
|---|---|
| Wages and Salaries | $250,000 |
| Paylocity Fee | $500 |
| Employee Agreement Payments (retention) (only at termination of employment) | $914,221 |
| Employee Agreement Payments (severance) (only at termination of employment) | $488,799 |
| Employee Bonus Programs | $35,000 |
| Vacation (only at termination of employment) | $5,935 |
| Paid Holidays | $0 |
| Health Plan | $20,000 |
| Dental Plan | $1,000 |
| Vision Plan | $200 |
| Life and Disability Plans | $1,500 |
| COBRA | $0 |
| Flex Benefits Fee | $200 |
| WC Program | $20,000 |
| Retirement Plan | $2,500 |
| Employee Expenses | $5,000 |
| Employee Withholdings | $13,000 |
| Payroll Taxes | $180,000 |

## IV.  BASIS FOR RELIEF

### A.  Certain Proposed Payments are Accorded Priority Under Bankruptcy Code Section 507

55.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, commissions, vacation, sick time, and employee benefit contributions be accorded priority in payment in an amount not to exceed $12,475 for each employee (to the extent such amounts accrued within 180 days of the Petition Date).  USA

25

Discounters is not seeking authority to pay to any individual Employee on account of prepetition claims for such Employee's accrued wages, severance, and/or Vacation amounts in excess of the statutory caps of Bankruptcy Code sections 507(a)(4) and 507(a)(5). Thus, granting the relief requested is consistent with the Bankruptcy Code's purpose in ensuring employees are paid in full on account of the priority status of their claims. Accordingly, USA Discounters submits that no prejudice to general unsecured creditors would result from granting the relief requested herein.

**B.     Payment of Certain Prepetition Employee Obligations is Required Under Section 541 of the Bankruptcy Code**

56.     USA Discounters also seeks authority to remit certain deductions, withholdings, and payroll taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain deductions, including contributions to various Benefit Programs and child support and alimony payments, are not property of USA Discounters' estate because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b); *cf. Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 721-22 (4th Cir. 1998) (holding funds from various lenders held by closing agent in trust for designated third parties were not property of the debtor's estate); *In re Am. Int'l Airways, Inc.*, 70 B.R. 102, 104-05 (Bankr. E.D. Pa. 1987) (explaining how funds held by the debtor to be paid for federal taxes are held in trust and are not property of the estate).

57.     Further, federal and state laws require USA Discounters and its officers to remit certain tax payments that have been withheld from their Employees' paychecks. *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax

26

from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. United States (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).

58.    Because the Employee Withholdings are not property of USA Discounters' estate, USA Discounters requests that this Court authorize USA Discounters to transmit the Employee Withholdings to the proper parties during the pendency of these Cases.

**C.    The Proposed Payments are Appropriate Under Sections 105(a) and 363 of the Bankruptcy Code, and the Doctrine of Necessity**

59.    Courts generally acknowledge that it is appropriate to authorize the payment of prepetition obligations when necessary to protect and preserve the estate. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (authority to pay prepetition claims of suppliers).

**a.    The Court May Authorize Payment of the Prepetition Employee Obligations Under Section 363 of the Bankruptcy Code**

60.    Under section 363(b) of the Bankruptcy Code, after notice and a hearing, a bankruptcy court may authorize a debtor to use property of the estate other than in the ordinary course of business. Under the same section, a court should authorize non-ordinary course business transactions when the debtor has articulated a valid business justification for the requested use of estate assets. *See Ionosphere Clubs*, 98 B.R. at 175 (section 363(b) gives the court "broad flexibility" to make payments outside of ordinary course of business as long as the debtor articulates a business justification); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section

27

363(b)], courts require the debtor to show that a sound business purpose justifies such actions.");
*In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

61.    USA Discounters has satisfied the business judgment standard. Payment of the Prepetition Employee Obligations serves the sound business purpose of maximizing the value of the Debtors' estates. The Debtors' success in these Cases hinges in large part on the morale and continued efforts of USA Discounters' Employees. Through the payment of the Prepetition Employee Obligations, USA Discounters seeks to motivate and encourage the Employees to continue to support USA Discounters during the pendency of these Cases. Accordingly, this Court should grant the requested relief under section 363(b) of the Bankruptcy Code.

62.    Furthermore, specifically with respect to the Employee Agreement Payments, courts have found that the implementation of reasonable non-insider employee retention payments pursuant to section 363(b) is a valid exercise of a debtor's business judgment. *See,*

*e.g., In re Montgomery Ward*, 242 B.R. at 155 (affirming bankruptcy court approval of retention payments because debtors demonstrated sound business purpose, namely the "need to implement these programs to stabilize the turnover rate, boost employee morale and retain key employees"); *In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 5, 2009) (Docket No. 436) (approving non-insider retention payments "based on the Debtors' sound business judgment" under section 363(b)); *In re New Century TRS Holdings Inc.*, Case No. 07-10416 (KJC) (Bankr. D. Del. May 29, 2007) (Docket No. 896) (approving reasonable employee retention payments under section 363(b)); *In re Flintkote Co.*, Case No. 04-11300 (JFK) (Bankr. D. Del. Aug. 30, 2004) (Docket No. 218) (approving employee retention payments as a sound exercise of the debtor's business judgment under section 363(b)(1)).[6]

63.    As with the Prepetition Employee Obligations generally, the Debtors have satisfied the business judgment standard with respect to the Employee Agreement Payments. The Employee Agreement Payments are specifically tailored to combat the rising attrition rate faced by USA Discounters in the wake of the ongoing store closures and the corresponding reductions in work force, and are designed to boost Employee morale and retain certain Employees who are critical to the successful completion of the wind-down process. The need to implement the Employee Agreement Payments to stabilize the turnover rate, boost employee morale, and retain key employees is a sound business purpose. Accordingly, this Court should grant the requested relief as a sound exercise of business judgment under section 363(b) of the Bankruptcy Code.[7]

---

[6] Copies of these orders are available upon request, and have not been included because they are too voluminous.

[7] The obligations incurred under the Employee Agreements do not implicate sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code because no Employee Agreements were entered into with insiders and thus the Employee Agreement Payments are not transfers to insiders of the Debtors. *See* 11 U.S.C. §§ 503(c)(1), (c)(2). Additionally, these prepetition Employee Agreements do not constitute a "KERP" proposed by the Debtors postpetition. Nevertheless, to the extent section 503(c)(3) is implicated, the Employee Agreement Payments are amply justified

64.     In addition, because USA Discounters pays the Prepetition Employee Obligations in the ordinary course of business, USA Discounters submits that Court approval to continue its existing policies, programs, and related payments postpetition is not necessary, because of the authority granted by section 363(c) of the Bankruptcy Code. Nonetheless, for the avoidance of doubt, USA Discounters requests that the Court grant the relief requested herein and enter an order authorizing the payment of the Prepetition Employee Obligations, and permitting USA Discounters, in its discretion, to continue USA Discounters' practices, programs, policies, and plans for Employees as those practices, programs, policies, and plans were in effect as of the Petition Date, as such may be modified, terminated, amended, or supplemented from time to time in USA Discounters' sole discretion hereafter.

### b.     Proper Application of the Doctrine of Necessity

65.     Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A Bankruptcy Court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175. Moreover, "[u]nder Section 105, the court can permit preplan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In*

---

by the facts and circumstances of the case. *See, e.g., In re Nortel Networks*, 2009 Bankr. LEXIS 5496, at *4-5 (holding non-insider retention payments were "justified by the facts and circumstances of the Debtors' chapter 11 proceedings and satisfy in all respects the requirements of 11 USC § 503(c)"); *In re New Century*, Case No. 07-10416 (KJC) (Bankr. D. Del. May 29, 2007) (Docket No. 896) (finding non-insider retention payments "justified under the facts and circumstances of these cases"); *In re Residential Capita LLC*, 491 B.R. 73, 85-86 (Bankr. S.D.N.Y. 2013) (approving under section 503(c)(3) non-insider retention payments of approximately $4.4 million because "[f]ailure to retain these employees would cause the Debtors to incur significant costs replacing those employees and it would delay the wind-down, imposing further costs on the estate"); *In re Dewey & Leboeuf LLP*, No. 12-12321, 2012 Bankr. LEXIS 3484, at *13 (Bankr. S.D.N.Y. July 30, 2012) (concluding reasonable retention payments were justified because payments "to the selected Employees are explicitly contingent upon them remaining with the Debtor for a fixed period of time" and were thus "clearly tailored specifically to achieve" the "stated goal of the Debtor … to stem the tide of Employee attrition").

*re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at

177). The authority to pay such prepetition obligations is known as the "necessity of payment"

rule (also referred to as the "doctrine of necessity"). *See Ionosphere Clubs*, 98 B.R. at 176.

66.     The United States Court of Appeals for the Third Circuit recognized the

"necessity of payment" doctrine in *In re Lehigh and New England Railway Co.*, 657 F.2d 570,

581 (3d Cir. 1981). Moreover, the doctrine of necessity is an accepted component of modern

bankruptcy jurisprudence. *See In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir.

1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of

creditors where those creditors will not supply services or material essential to the conduct of the

business until their pre-reorganization claims shall have been paid"); *In re Just For Feet, Inc.*,

242 B.R. 821, 826 (D. Del. 1999) (approving payment of key inventory suppliers' prepetition

claims when such suppliers could destroy debtor's business by refusing to deliver new inventory

on eve of debtor's key sales season); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546–47

(Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such

suppliers agree to provide postpetition trade credit); *see also In re Ionosphere Clubs, Inc.*, 98

B.R. at 175; *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994); *Official

Comm. of Unsecured Creditors of Motor Coach Indus. Int'l, Inc. v. Motor Coach Indus. Int'l,

Inc. (In re Motor Coach Indus. Int'l, Inc.)*, No. 08-12136 BLS, 2009 WL 330993, at *3 (D. Del.

Feb. 10, 2009) (denying a stay pending appeal on the grounds that there is not a serious basis to

challenge the doctrine of necessity in the Third Circuit).

67.     Application of the doctrine of necessity is justified when necessary to preserve the

value of the estate for all stakeholders. *In re Just for Feet, Inc.*, 242 B.R. at 826 (stating that

where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of

31

necessity should be invoked to permit payment); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021,

1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a

debtor must show that the payment is necessary to avert a serious threat to the Chapter 11

process.").

68.     Moreover, courts have recognized the applicability of the doctrine of necessity

with respect to the payment of prepetition employee compensation and benefits. *See, e.g., Mich.*

*Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R.

279, 285–89 (S.D.N.Y. 1987) (under "necessity of payment" doctrine, it is appropriate for

bankruptcy court to defer to Debtors' business judgment in permitting payment of certain

workers' compensation claims); *Ionosphere Clubs*, 98 B.R. at 176 ("This rule recognizes the

existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition

claims where such payment is essential to the continued operation of the debtor.").

69.     Accordingly, the doctrine of necessity similarly justifies the relief requested

herein.  Indeed, USA Discounters believes that without the relief requested herein being granted,

there is great risk that the Employees required going forward will seek alternative opportunities.

Such a development would deplete USA Discounters' workforce, thereby hindering the Debtors'

ability to successfully conduct these Cases.  Paying prepetition wages, employee benefits, and

similar items will benefit the Debtors' estates and their creditors by allowing the Debtors to

conduct these Cases effectively.  Therefore, the relief requested represents a sound exercise of

business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates,

and is therefore justified under the applicable authority.

70.     Courts in and out of this district routinely approve payment of prepetition claims

for compensation, benefits, and expense reimbursements similar to those described herein. *See,*

32

*e.g.*, *In re The Wet Seal, Inc.*, Case No. 15-10081 (CSS) (Bankr. D. Del. Jan. 20, 2015) (Docket No. 96); *In re Deb Stores Holding LLC, et al.*, No. 14-12676 (MFW) (Bankr. D. Del. Dec. 5, 2014) (Docket No. 50); *In re Unitek Global Services, Inc., et al.*, No. 14-12471 (PJW) (Bankr. D. Del. Nov. 4, 2014) (Docket No. 64); *In re dELiA*s, INC., et al.*, No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2014) (Docket No. 49).

71.    Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

## V. RESERVATION OF RIGHTS

72.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to dispute any claim asserted by an Employee or other party under applicable non-bankruptcy law. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VI. IMMEDIATE RELIEF IS NECESSARY

73.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## VII. WAIVER OF ANY APPLICABLE STAY

74.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for USA Discounters to operate its business without interruption and to preserve value for the Debtors' estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

<strong>VIII.  NOTICE</strong>

75.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (iii) the Prepetition Agent; (iv) the Banks; and (v) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

34

## IX. CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Dorsey Declaration, the

Debtors respectfully request that this Court enter an order, substantially in the form attached

hereto, granting the relief requested in the Motion and such other and further relief as is just and

proper.

Dated:  August 24, 2015

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Colin R. Robinson (DE Bar No. 5524)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:    (302) 652-4100
Fax:    (302) 652-4400
Email: ljones@pszjlaw.com
        joneill@pszjlaw.com
        crobinson@pszjlaw.com

and

Lee R. Bogdanoff, Esq.
Michael L. Tuchin, Esq.
Whitman L. Holt, Esq.
Sasha M. Gurvitz, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4023
Fax:    (310) 407-9090
Email: lbogdanoff@ktbslaw.com
        mtuchin@ktbslaw.com
        wholt@ktbslaw.com
        sgurvitz@ktbslaw.com

*[Proposed] Counsel to the Debtors and Debtors
in Possession*

DOCS_DE:201396.1 88601/001